**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**BISCAYNE COMMONS (EDENS), LLC,**

        **Plaintiff,**

**vs.**

                               **Case No. 1:16-cv-25080-XXXX**

**PALM BEACH GOLF CENTER – MIAMI,**
**LLC, WILLIAM J. WASH, and MARK C.**
**TRAVAGLINI,**

        **Defendants.**

_____/

## COMPLAINT

    The plaintiff, **BISCAYNE COMMONS (EDENS), LLC ("Edens")**, by and through its undersigned counsel, sues the defendants, **PALM BEACH GOLF CENTER – MIAMI, LLC ("Tenant"), WILLIAM J. WALSH ("Walsh"), and MARK C. TRAVAGLINI ("Travaglini"),** and alleges:

### JURISDICTION, VENUE, AND PARTIES

    1.      This is an action for damages exceeding $75,000.00, exclusive of costs, interest, and attorney's fees.

    2.      Edens is a South Carolina Limited Liability Company authorized to conduct business in Florida with its principal business office in Columbia, South Carolina.  Edens is a citizen of and is domiciled in South Carolina.

    3.      Tenant is a Florida Limited Liability Company with its principal business office in Palm Beach Gardens, Florida.  Tenant is a citizen of and is domiciled in Florida.

    4.      Walsh resides in and is domiciled in West Palm Beach, Florida.  Waslh is a citizen of and is domiciled in Florida.

5.      Travaglini resides in and is domiciled in Jupiter, Florida.   Travaglini is a citizen of and is domiciled in Florida.

6.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because: (a) the amount in controversy exceeds $75,000.00, exclusive of interest, costs, and attorneys' fees, and (b) there is complete diversity of citizenship between Edens and the defendants.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the dispute involves a shopping center lease located in North Miami, Florida.

## COUNT I:  BREACH OF LEASE

8.      On September 25, 2012, Edens, as Landlord, and Tenant entered into a Shopping Center Lease Agreement (the "Lease") for the premises located at store spaces #100 and 110 of the Biscayne Commons Shopping Center, 14791 Biscayne Boulevard, North Miami, Florida (the "Premises").   A true and authentic copy of the Lease is attached as **Exhibit A.**

9.      The Lease term was five years from the Commencement Date, which was April 8, 2013.

10.      Pursuant to the Lease, Tenant was required to pay monthly rent charges and to continually occupy and conduct its business in the Premises throughout the Lease term.

11.      Tenant failed to pay its required rent payments from July, 2016, through December, 2016.

12.      Tenant failed to continually occupy the Premises throughout the Lease term. Tenant abandoned the Premises sometime prior to July 8, 2016.

13.      Tenant has breached the Lease by failing to pay its required rent payments and by abandoning the Premises prior to the expiration of the Lease term.

2

14.     As a result of the breaches of the Lease, Edens has been damaged.

15.     By letter dated November 21, 2016, Edens demanded payment of all past due, unpaid rent charges, but Tenant failed to pay anything to Edens following its receipt of the demand letter.   A true and authentic copy of the demand letter is attached as **Exhibit B.**

16.     As of December 5, 2016, Tenant owes Edens $184,680.46 in past due, unpaid rent charges under the Lease.    Edens will continue to incur damages each month in which rent payments are not paid through the end of the Lease term.

17.     Additionally, pursuant to the terms of Article 1A.3 of the Lease, Edens is entitled to recover from Tenant as rent the tenant improvement allowance paid by Edens in the amount of $210,000.

18.     Pursuant to the terms of the Lease, Edens is entitled to recover its costs and attorney's fees from Tenant.

19.     Edens has retained The Rosenthal Law Firm, P.A., to represent it in this action and is obligated to pay a reasonable fee for services rendered on its behalf.

20.     All conditions precedent to Eden's right to bring this claim have occurred or have been performed.

**WHEREFORE,** Edens demands a judgment against Tenant for damages, costs, interest, and attorney's fees.

## COUNT II:  GUARANTY

21.     Edens realleges paragraphs 8 through 18.

22.     To induce Landlord to enter into the Lease with Tenant, on September 25, 2012, Walsh and Travaglini (together, the "Guarantors") executed a Guaranty of Lease (the

"Guaranty") in which Guarantors personally guaranteed payment of all rent charges owing by Tenant to Landlord.   A true and authentic copy of the Guaranty is attached as **Exhibit C.**

23.    Pursuant to the terms of the Guaranty, Guarantors' obligation is limited to an amount equal to one year's of rent under the Lease.

24.    Guarantors have breached the Guaranty by failing to pay the rent charges owing by Tenant.

25.    As a result of the breach, Edens has been damaged in the amounts set forth in paragraphs 16 and 17.

26.    Pursuant to the terms of the Guaranty, Edens is entitled to recover its costs and attorney's fees from Guarantors.

27.    Edens has retained The Rosenthal Law Firm, P.A., to represent it in this action and is obligated to pay a reasonable fee for services rendered on its behalf.

28.    All conditions precedent to Eden's right to bring this claim have occurred or have been performed.

**WHEREFORE,** Edens demands a judgment against Tenant for damages, costs, interest, and attorney's fees.

/s/ Jason A. Rosenthal
Jason A. Rosenthal
Florida Bar No. 0009482
**The Rosenthal Law Firm, P.A.**
976 Lake Baldwin Lane, Ste. 103
Orlando, FL 32814
jrosenthal@therosenthallaw.com
service@therosenthallaw.com
Phone 407.488.1220
Fax 407.488.1228
Attorneys for Edens

4

SHOPPING CENTER LEASE AGREEMENT

BY AND BETWEEN


BISCAYNE COMMONS (EDENS), LLC
("Landlord")


and


PALM BEACH GOLF CENTER – MIAMI, LLC
("Tenant")

Doing Business As

Palm Beach Golf Center

DATED: _S< span>eptember 25_ , 2012

EXHIBIT A

# SHOPPING CENTER LEASE AGREEMENT
## TABLE OF CONTENTS

| | | |
|---|---|---|
| ARTICLE 1 | DEFINITIONS AND CERTAIN BASIC PROVISIONS | 1 |
| ARTICLE 1A | CERTAIN SPECIAL PROVISIONS | 2 |
| ARTICLE 2 | GRANT | 5 |
| ARTICLE 3 | RENT | 5 |
| ARTICLE 4 | PERCENTAGE RENT | 6 |
| ARTICLE 5 | GROSS SALES REPORTING | 6 |
| ARTICLE 6 | ADDITIONAL RENT | 6 |
| ARTICLE 7 | SECURITY DEPOSIT | 7 |
| ARTICLE 8 | COMMENCEMENT OF TERM AND RENT | 7 |
| ARTICLE 9 | LEASED PREMISES | 8 |
| ARTICLE 10 | USE OF PREMISES | 8 |
| ARTICLE 11 | CONTINUOUS OPERATION | 9 |
| ARTICLE 12 | RETAIL RESTRICTION LIMIT | 9 |
| ARTICLE 13 | CARE OF PREMISES | 9 |
| ARTICLE 14 | COMMON AREAS AND PARKING | 10 |
| ARTICLE 15 | TAX RESPONSIBILITIES | 10 |
| ARTICLE 16 | MECHANIC'S LIEN | 11 |
| ARTICLE 17 | PAYMENTS OF PRO RATA SHARE OF EXPENSES, TAXES AND INSURANCE | 11 |
| ARTICLE 18 | CONSTRUCTION OF IMPROVEMENTS | 12 |
| ARTICLE 19 | FIXTURES AND INTERIOR ALTERATIONS | 12 |
| ARTICLE 20 | INDEMNIFICATION AND PUBLIC LIABILITY INSURANCE | 13 |
| ARTICLE 21 | NON-LIABILITY; GENERAL DAMAGE AND FIRE DAMAGE | 14 |
| ARTICLE 22 | HAZARD INSURANCE BY LANDLORD | 15 |
| ARTICLE 23 | MUTUAL WAIVER OF SUBROGATION | 16 |
| ARTICLE 24 | DEFAULT BY TENANT | 16 |
| ARTICLE 25 | WAIVER OF TRIAL BY JURY | 17 |
| ARTICLE 26 | LIEN OF LANDLORD FOR RENT, TAXES AND OTHER SUMS | 18 |
| ARTICLE 27 | DEFAULT BY LANDLORD | 18 |
| ARTICLE 28 | TENANT'S REPAIRS | 18 |
| ARTICLE 29 | LANDLORD'S REPAIRS | 19 |
| ARTICLE 30 | UTILITIES | 19 |
| ARTICLE 31 | RIGHT OF ACCESS | 20 |
| ARTICLE 32 | SIGNS | 20 |
| ARTICLE 33 | FORCE MAJEURE | 21 |
| ARTICLE 34 | QUIET ENJOYMENT | 21 |
| ARTICLE 35 | BANKRUPTCY | 21 |
| ARTICLE 36 | CONDEMNATION | 22 |
| ARTICLE 37 | ASSIGNMENT AND SUBLETTING | 22 |
| ARTICLE 38 | SUBORDINATION AND ATTORNMENT | 24 |
| ARTICLE 39 | TENANT'S ESTOPPEL CERTIFICATE | 25 |
| ARTICLE 40 | EXCULPATION | 25 |
| ARTICLE 41 | NOTICE | 26 |
| ARTICLE 42 | HOLDING OVER | 26 |
| ARTICLE 43 | PARTIAL INVALIDITY | 26 |
| ARTICLE 44 | SIGNATURES REQUIRED | 26 |
| ARTICLE 45 | NO JOINT VENTURE | 26 |
| ARTICLE 46 | TIME OF ESSENCE | 27 |
| ARTICLE 47 | ACCORD AND SATISFACTION | 27 |
| ARTICLE 48 | RECORDATION | 27 |
| ARTICLE 49 | CAPTIONS | 27 |
| ARTICLE 50 | RESPONSIBILITY OF TENANT | 27 |
| ARTICLE 51 | SURRENDER OF PREMISES | 27 |
| ARTICLE 52 | GOVERNING LAW AND INTERPRETATION | 27 |
| ARTICLE 53 | BROKERS | 27 |

ARTICLE 54   ATTORNEYS' FEES; LANDLORD'S FEES AND EXPENSES ........................................ 28
ARTICLE 55   ABANDONMENT OF PERSONAL PROPERTY .......................................................... 28
ARTICLE 56   ADA PROVISION ....................................................................................................... 28
ARTICLE 57   CLARIFICATION OF TERMS .................................................................................... 29
ARTICLE 58   ENVIRONMENTAL MATTERS ................................................................................ 29
ARTICLE 59   **PERSONAL INTEREST DISCLOSURE** ................................................................ 31
ARTICLE 60   RADON GAS ............................................................................................................... 31
ARTICLE 61   LIQUOR LIABILITY INSURANCE ........................................................................... 31
ARTICLE 62   NO WAIVERS; AMENDMENTS ............................................................................... 31
ARTICLE 63   **ENTIRE AGREEMENT** .......................................................................................... 31
ARTICLE 64   **TENANT COVENANTS** ......................................................................................... 32
ARTICLE 65   SUCCESSORS AND ASSIGNS ................................................................................. 32
ARTICLE 66   GUARANTOR .............................................................................................................. 32
ARTICLE 67   AUTHORITY ................................................................................................................ 32
ARTICLE 68   CONFIDENTIALITY ................................................................................................... 32
ARTICLE 69   TERMINATION ........................................................................................................... 33
ARTICLE 70   NOTICE TO MORTGAGEE ....................................................................................... 33

**EXHIBITS**

Exhibit A      Site Plan
Exhibit B      Landlord's Work
Exhibit C      Tenant's Work
Exhibit D      Sign Criteria
Exhibit D-1
Exhibit E      Form of Guaranty of Lease
Exhibit F      Form of Access Agreement

## SHOPPING CENTER LEASE AGREEMENT

This Lease ("Lease"), entered into this __25TH__ day of ___September___, 2012, between the landlord and the tenant hereinafter named:

## ARTICLE 1
## DEFINITIONS AND CERTAIN BASIC PROVISIONS

In addition to other terms which are elsewhere defined in this Lease, the following terms when used in this Lease with the first letter of each word capitalized shall have the meanings set forth in this section, and only such meanings, unless such meanings are expressly limited or expanded elsewhere herein.

(A)  **LANDLORD:**  Biscayne Commons (EDENS), LLC, a South Carolina limited liability company

(B)  **ADDRESS:**  c/o Edens Limited Partnership
Attn:  Legal Department
1221 Main Street, Suite 1000
Columbia, South Carolina  29201

(C)  **RENT PAYMENT ADDRESS:**  Biscayne Commons (EDENS), LLC
Department #2438
PO Box 536856
Atlanta, GA 30353-6856

(D)  **TENANT:**  Palm Beach Golf Center – Miami, LLC, a Florida limited liability company

(E)  **TENANT'S ADDRESS:**  3801 PGA Blvd, Suite 604
Palm Beach Gardens, FL  33410

(F)  **TENANT'S TRADE NAME:**  Palm Beach Golf Center

(G)  **SHOPPING CENTER NAME & LEASED PREMISES ADDRESS:**  Biscayne Commons
_____ Biscayne Blvd
North Miami, FL 33181

(H)  **LEASED PREMISES:** For purposes of this Lease Agreement, the gross leasable square footage of the Leased Premises shall be deemed to be approximately 8,400 square feet, in store spaces #100 and 110, such premises being crosshatched on the plan attached hereto as **Exhibit "A"**, and being a part of the Shopping Center.

(I)  **LEASE TERM:**  Commencing on the "Commencement Date" as hereinafter defined and ending five (5) years thereafter except that in the event the Commencement Date is a date other than the first day of a calendar month, said Lease Term shall extend for the number of days remaining in the calendar month following the Commencement Date, as further defined in Article 8.

(J)  **COMMENCEMENT DATE:**  One hundred eighty (180) days following the later of: (i) the date Landlord delivers the Leased Premises to Tenant; or (ii) the date Landlord approves the plans for "Tenant's Work," as defined in Article 18 of this Lease.  Notwithstanding the foregoing, in no event shall the Commencement Date occur later than two hundred forty (240) days following the date Landlord delivers the Leased Premises to Tenant, as further defined in Article 8.

(K)  **MINIMUM GUARANTEED RENT:**  As stated below, payable in advance, as further defined in Article 3.

| Lease Year | PSF | Monthly Rent | Annual Rent |
|---|---|---|---|
| 1 | $30.00 | $21,000.00 | $252,000.00 |
| 2 | $30.90 | $21,630.00 | $259,560.00 |
| 3 | $31.83 | $22,281.00 | $267,372.00 |
| 4 | $32.78 | $22,946.00 | $275,352.00 |
| 5 | $33.77 | $23,693.00 | $283,668.00 |

(L)  **PERCENTAGE RENT:** *[Not Applicable]*

(M)  **INITIAL COMMON MAINTENANCE EXPENSE** (excluding Taxes and Insurance (as defined in Article 17)) payment per month, adjusted annually, as further defined in Articles 14 and 17:  $2,135.00.

(N)  **INITIAL TAX EXPENSE** payment per month, adjusted annually, as further defined in Article 17:  $4,333.00.

(O)  **INITIAL INSURANCE EXPENSE** payment per month, adjusted annually, as further defined in Articles 17, 20, 21 and 22:  $763.00.

(P)  **TOTAL INITIAL MONTHLY RENT PAYMENT:**  $30,207.17 (including sales tax) due upon Tenant's execution of this Lease.  Tenant will be responsible for paying any sales tax applicable to Rent, which is currently at the rate of 7.0% for Miami-Dade County, Florida.

(Q)  **SECURITY DEPOSIT**, as further defined in Article 7:  $30,207.17 due upon Tenant's execution of this Lease.

(R)  **PERMITTED USE**, as further defined in Article 10: The Leased Premises shall be used for the operation of a retail store selling golf equipment and accessories, golf-related soft goods, and incidentally providing repair services for golf equipment, golf lessons, club fittings and other incidental sales related to the operation of a retail golf store, and for no other purpose

(S)  **LEASE YEAR:**  The first twelve (12) full calendar months after the Commencement Date and each succeeding twelve (12) month period thereafter, or, at Landlord's option, such other twelve (12) month period as Landlord shall determine from time to time.

(T)  **SHOPPING CENTER**: The real estate owned by Landlord at the Leased Premises as set forth in 1(G) above on which the buildings and other improvements are now or hereafter placed thereon, together with such changes, additions, or deletions thereto as Landlord may from time to time designate.  Landlord reserves the right to change the size, number and location of buildings and other improvements which from time to time constitute a part of the Shopping Center, provided that reasonable access to the Leased Premises and the parking areas shall not be materially impaired.

(U)  **COMMON AREAS:** Those areas of the Shopping Center which are from time to time made available by Landlord for use by the tenants of the Shopping Center and/or by the public, such as, by way of illustration but not limitation, parking areas, driveways, truckways, delivery passages, common truck loading areas, walkways, planted areas, landscaped areas, community rooms, and restrooms which are not leased to or reserved for individual tenants.

(V)  **ADDITIONAL RENT:** Additional Rent as defined in Articles 6 and 17.

(W)  **RENT:** Minimum Guaranteed Rent and Additional Rent.

(X)  **GUARANTOR:**  William J. Walsh and Mark C. Travaglini, jointly and severally

(Y)  **BROKER:**  Brandon Weiss, NAI Miami.

## ARTICLE 1A
## CERTAIN SPECIAL PROVISIONS

In addition to other terms and provisions of this Lease, the following provisions shall apply (and in the event of any conflict between the provisions of this Article 1A and any other provision of this Lease, the terms of this Article 1A shall control):

**1A.1   LANDLORD SUSTAINABILITY INITIATIVES AND PRACTICES**

Tenant shall adhere at all times during the Lease Term to reasonable rules, regulations, specifications, and related programs from time to time implemented by Landlord to assure the sustainability of the Shopping Center operation in accordance with the terms of this Lease (collectively, the "Shopping Center Sustainability Practices").

The Shopping Center Sustainability Practices may from time to time be implemented by the promulgation of uniformly-applied rules and regulations, Tenant Handbook, construction specifications and materials manual, and lists of recommended vendors in order to assist Tenant's compliance herewith, or any combination thereof.

**1A.2   EXCLUSIVE USE:**

(a)    Non-competition.   Subsequent to the date that this Lease is executed and throughout the remainder of the Lease Term, Landlord agrees not to enter into any other lease or occupancy agreement that permits a premises in the Shopping Center as currently in existence and shown in Exhibit A attached to this Lease to be used for a "Competing Business" (as defined below).

(b)    Definitions.

(i)    "Exclusive Use" shall mean golf equipment and related accessories and the repair of golf equipment.

(ii)    "Competing Business" shall mean a business which uses its premises in the Shopping Center owned by Landlord principally for the Exclusive Use, except that the Competing Business restrictions shall not apply to (i) any tenants or occupants of the Shopping Center as the date of this Lease; (ii) uses of future occupants of the Shopping Center who are in possession under leases in effect as of the date of this Lease; (iii) any renewals, substitutions, relocations or replacements of any tenants, occupants or future occupants in possession as of the date of this Lease provided the primary use of such renewal, substitute, relocated or replacement tenant is substantially the same as the corresponding primary use as of the date of this Lease; (iv) any stores or tenants who occupy more than 10,000 square feet at the Shopping Center or any stores or tenants in any adjoining property that may from time to time be integrated with the operation of or become part of the Shopping Center as presently existing; (v) a tenant or occupant that sells goods, products or services that fall within the Exclusive Use definition if such sales are not the principal business of such tenant or occupant; or (vi) if the Leased Premises currently occupied by Tenant ceases to be used principally for the Exclusive Use.

(c)    Automatic Termination.   The restrictions of subsection (a) above shall automatically cease and terminate if (i) Tenant fails to operate in the Leased Premises in accordance with Article 10 of this Lease for a period of ten (10) days or longer (closing caused by fire, casualty, eminent domain or remodeling for reasonable periods of time excepted); (ii) the Leased Premises ceases to be used principally for the Exclusive Use; (iii) a Default occurs that is not cured within fifteen (15) days after the expiration of the original grace period; or (iv) an assignment occurs under the terms of Article 37 of this Lease without Landlord's consent (excluding only an assignment for which Landlord's consent is not required pursuant to Article 37).   Nothing in this subsection (c) shall be deemed to imply that Tenant may close its business or change its use other than as may be expressly permitted in this Lease.   The Leased Premises shall not be deemed to be used principally for the Exclusive Use unless more than 75% of the Leased Premises is devoted to the Exclusive Use and more than 75% of the annual Gross Sales from the Leased Premises are generated by the Exclusive Use.

In the event that any prospective tenant or any governmental authority challenges the validity of the Exclusive Use either by the institution of legal action or by another governmental tribunal, Tenant shall, upon written notice thereof from Landlord, either forfeit and waive its exclusive use right or defend the challenge

-3-

with counsel of its own selection, whereupon Tenant agrees to indemnify and hold Landlord harmless from and against any claims, expenses, damages, fines and liability arising from the granting to Tenant of the Exclusive Use. This indemnity shall survive the termination of this Lease.

**1A.3   TENANT IMPROVEMENT ALLOWANCE**

Landlord shall pay to Tenant the lesser of (a) the total of the invoices submitted to Landlord under subsection (iii) hereof or (b) $210,000.00 (the "Tenant Improvement Allowance"), which shall be used by the Tenant to contribute to the build-out requirements and improvements to the Leased Premises. Payment of the Tenant Improvement Allowance will be made to Tenant within 30 days following Tenant delivering to Landlord the following documentation: (i) a copy of the Certificate of Occupancy for the Leased Premises; (ii) Final Waivers of Lien from all of Tenant's contractors in form and substance satisfactory to Landlord; (iii) copies of paid invoices totaling an amount equal to or greater than the Tenant Improvement Allowance for work to the Leased Premises for which the Tenant Improvement Allowance will be applied; (iv) proof of installation of a Landlord approved exterior sign on the Leased Premises which identifies Tenant's business; (v) Tenant's notice to Landlord that the Leased Premises has opened for business to the public; and (vi) payment of first months' Rent. In the event of default under this Lease by Tenant, which default shall not have been fully cured by Tenant within any applicable cure period allowed under this Lease, any and all portions of the Tenant Improvement Allowance which shall have theretofore been disbursed to Tenant shall constitute Additional Rent and shall be immediately due and payable to Landlord, and any amounts not yet paid to Tenant shall be retained by Landlord as Additional Rent.

**1A.4   CO-TENANCY**

In the event that, at any time during the initial Term of this Lease, Publix ceases doing business at the Shopping Center for a period of more than ninety (90) days (except any closing for reasons of Force Majeure, condemnation, or casualty, or remodeling (each an "Excused Closing")), then Tenant shall give notice to Landlord and, commencing upon the day following such ninety-day closure period and continuing until the date that Publix, or its comparable replacement in a majority of the space previously occupied by Publix, opens for business in the Shopping Center, Tenant's obligation to pay Minimum Guaranteed Rent shall be reduced to 50% of the applicable amount for such period as set forth in the Lease. All Additional Rent and any other amounts due by Tenant under the Lease shall continue to be payable at the full rates. Notwithstanding the foregoing, should Tenant's right to pay reduced Minimum Guaranteed Rent hereunder continue for a period of twelve (12) months, then Tenant shall have the right to terminate this Lease by giving written notice to Landlord within thirty (30) days following the end of such 12-month period. In the event Tenant gives its termination notice to Landlord in accordance with the foregoing, this Lease shall terminate sixty (60) days following Landlord's receipt of Tenant's termination notice as if such day was the last day of the Lease Term. If no termination notice is received by Landlord within the aforementioned 30-day period, then Tenant's obligation to pay Minimum Guaranteed Rent shall be restored to 100% of the then-applicable amount and Tenant shall have no further right to terminate hereunder. Notwithstanding anything in this Lease to the contrary: (i) the remedies set forth in this paragraph shall be Tenant's sole and exclusive remedies should Publix close for business (except for an Excused Closing); and (ii) the remedies available to Tenant under this Section 1A.4 are personal to the named Tenant only, and are not transferrable upon an assignment of this Lease by Tenant.

**1A.5   BROWNFIELD DISCLOSURE AND NOTICE REGARDING GAS MITIGATION**

[TO BE INSERTED]

**ARTICLE 2**
**GRANT**

In consideration of the Rent agreed to be paid and of the covenants and agreements made by the respective parties hereto, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord the Leased Premises, upon the terms and conditions herein provided, together with the right to use, in common with others entitled thereto, the Common Areas (as herein defined), subject to the terms and conditions of this Lease and to reasonable rules and regulations for the use thereof as prescribed from time to time by Landlord.

Landlord may relocate the Leased Premises and may increase, reduce or change the number, dimensions and location of the improvements comprising the Shopping Center or any of them in any manner as Landlord shall deem proper.

## 1A.5   BROWNFIELD PROVISIONS

**A. Tenant Acknowledgement.**  By execution of this Lease, Tenant acknowledges that Landlord has disclosed the following to Tenant and Tenant hereby acknowledges and understands that:  (i) the Shopping Center was formerly used as a landfill and that environmental remediation activities are being conducted pursuant to regulatory oversight from the Miami-Dade County Department of Environmental Resources Management ("MDC"), under that April 7, 2003, Brownfield Site Rehabilitation Agreement Pursuant to § 376.80(5) of the Florida Statutes, under file number SW-1428/File 19261 (the "BSRA"), a copy of which is will be provided to Tenant by Landlord upon request; (ii) the slab upon which the Leased Premises is constructed contains a structural barrier and venting system (the "GMS"), and Tenant shall not under any circumstances perform any modifications or work within or to the Leased Premises, specifically including but not limited to plumbing or electrical work, which could in any way effect, disturb or damage the GMS or underground utilities; (iii) the Leased Premises shall contain certain sensor(s) and/or alarm(s) connected to and forming a part of the GMS, which are mandated by the BSRA and shall not be interfered with, modified, or damaged in any way; (iv) Tenant contact information, including the name, mailing address, telephone and facsimile numbers, and e-mail address of Tenant, and a copy of this Lease may be delivered to the Department of Environment and Natural Resources ("DENR") or such other parties as may be required pursuant to the BSRA; (v) Tenant shall designate and provide contact information for one responsible party to serve on Tenant's behalf as Landlord's primary on-site point-of-contact for compliance with the BSRA; (vi) Tenant shall execute and deliver to Landlord, without charge, an Access Agreement in the form attached hereto as **Exhibit "F"** and made a part hereof by this reference; (vii) The Tenant shall fully and in good faith cooperate with Landlord, Landlord's contractors, the MDC, and other governmental agencies in the inspection of the GMS and Leased Premises pursuant to the BSRA and the performance and completion of any compliance work required pursuant thereto; (viii) Tenant shall execute and deliver to Landlord, without charge, a Tenant Notification Form and other documentation as requested by Landlord and/or required by the BSRA, and shall comply therewith, including that Tenant shall post any required notices in the Leased Premises in the proximity of the GMS sensor and/or alarm; and (ix) Prior to performing any work within the Leased Premises, Tenant shall give notice to Landlord and submit all proposed plans and specifications to Landlord for review.  Any work to be performed by Tenant shall be subject to the Landlord's right to modify the Tenant's scope of work, select the contractors to perform the work, provide work area supervision, and enforce health and safety protocols, all at Tenant's sole cost and expense.

**B. Indemnity.**  Tenant, on behalf of itself and its agents, contractors and employees (collectively the "Tenant Releasors"), does hereby release and forever discharge each of Landlord and Landlord's respective officers, directors, members, managers, agents, attorneys, employees, subsidiaries, affiliates, successors and assigns (collectively the "Landlord Released Parties"), as applicable, of and from any and all claims, actions, causes of action, demands, suits, covenants, agreements, representations, obligations, costs, liabilities, expenses, losses and debts of any nature whatsoever, both at law and in equity, relating to any matter, claim or right, whether presently known or unknown, asserted or unasserted, which any of the Tenant Releasors now has, ever had, or may have against the Landlord Released Parties arising from, relating to, or otherwise in connection with: (i) the Shopping Center's former use as a landfill; (ii) environmental assessment and remediation activities at the Shopping Center; or (iii) any adverse environmental condition that may exist or otherwise relate to the Shopping Center as of the date of this Lease.

Tenant shall not cause or permit any interference with, damage to, or alteration of the GMS or any part thereof, including the gas barrier, sensor(s) and/or alarm(s) located under, on or in the Leased Premises, and Tenant shall indemnify and hold harmless Landlord from any and all claims, damages, fines, judgments, penalties, costs, liabilities or losses (including, without limitation, a decrease in value of the Leased Premises, damages due to loss or restriction of rentable or usable space, or

any damages due that adversely impact the marketing of the space, and any and all sums paid for settlement of claims, attorneys' fees, reasonable consultant and expert fees) arising during the Lease Term or any renewal of this Lease, and arising as a result of same. This indemnification includes, without limitation, any and all costs incurred due to any investigation of the site or any cleanup, removal or restoration mandated by a federal, state or local agency or political subdivision. Without limitation of the foregoing, if Tenant causes or permits any such interference, damage or alteration, and such results in contamination, a release of gases, or any damage to persons or property as a result thereof, Tenant shall promptly, at its sole expense, take any and all necessary actions to return the Leased Premises to its prior condition. Tenant shall undertake no testing for the presence of gases or take any remedial actions without in each instance obtaining Landlord's prior written consent, which consent shall not be unreasonably withheld or delayed. Landlord and parties authorized by Landlord or applicable law the shall have access to the Leased Premises in order to investigate and test with respect to any suspected release of gas or any interference with, damage to, or alteration of the GMS or any part thereof, and to access the Leased Premises as needed for any remedial action deemed necessary by Landlord.

Tenant shall not mortgage, pledge or otherwise encumber its interest in this Lease or in the Leased Premises.

## ARTICLE 3
## RENT

Tenant agrees to pay Landlord, without notice, demand, deduction or offset whatsoever, the Minimum Guaranteed Rent as shown in Article 1(K), payable monthly in advance on the first day of each and every calendar month during the term of this Lease.

The first payment of Minimum Guaranteed Rent, the Initial Common Maintenance Expense, Initial Insurance Expense and the Initial Tax Expense, all as set forth in Article 1 hereof, shall be due simultaneously with Tenant's execution of this Lease. In the event that the Commencement Date shall occur on a day other than the first day of the month, the first rental payment shall be adjusted for the fractional monthly period so that all rental payments other than the first shall be due and payable on the first day of each month.

A late charge of Two Hundred Fifty Dollars ($250.00) shall be added to each and every monthly Rent payment (including Minimum Guaranteed Rent and Additional Rent) which is not received by Landlord prior to the tenth (10th) day of the month for which such payment is due. Such late charge, if added, shall be due and payable on or before the first (1st) day of the month immediately following the month for which the rent payment was not timely made. Any amount due from Tenant to Landlord hereunder which is not paid when due, including late payment charges, shall bear interest at a rate equal to the lesser of (i) one and one half percent (1.5%) per month from the due date until paid or (ii) the highest rate permitted under applicable law for such obligations. The payment of such interest shall not excuse or cure any default by Tenant under this Lease. Nothing contained in this Article 3 or elsewhere in this Lease shall enable Landlord to collect an amount of interest on past due amounts or penalties on late payments (if such penalties are deemed to be interest under applicable law) greater than that allowed by applicable law, and the terms and provisions of this Lease shall be deemed modified to comply with applicable law.

Landlord's election not to charge the stated five percent (5%) penalty for any late payment shall not constitute or be a waiver or preclude Landlord from charging such late payment penalty at other times. Landlord shall be entitled to collect from Tenant all expenses incurred by Landlord involving collection of late Rent, including, but not limited to, reasonable attorneys' fees and court costs.

Landlord shall apply any payments received from Tenant in the following order: first, toward the payment of any interest charges accrued against Tenant's account; second, toward the payment of any late charges and any legal expenses or additional administrative costs incurred by Landlord to enforce any provision of this Lease; third, toward the payment of Additional Rent, including, without limitation, Taxes, Insurance and/or Expenses (as defined in Article 17); and then, toward the payment of Minimum Guaranteed Rent.

## ARTICLE 4
## PERCENTAGE RENT

[Intentionally Omitted]

## ARTICLE 5
## GROSS SALES REPORTING

Tenant shall submit to Landlord a report signed by a public accountant or officer of Tenant, certifying the amount of Gross Sales (as hereinafter defined), shown on a monthly basis, during the preceding Lease Year. Such report shall be received by Landlord within forty-five (45) days after the end of each Lease Year.

The term "Gross Sales" as used herein shall mean the gross proceeds from business done in or from any part of the Leased Premises, including, without limitation, membership fees collected by Tenant, the total dollar amount of the actual sales price, whether for cash or on credit or partly for cash and partly on credit, of all sales of merchandise and services and of any and all other receipts of business conducted in or from the Leased Premises, including but not limited to, all gift and merchandise certificates, mail, telephone orders, or electronic transactions received or filled at or from the Leased Premises, deposits not refunded to purchasers including all sums paid on lay-away sales which are or shall become forfeited to Tenant, orders taken in and from the Leased Premises whether or not filled elsewhere (including but not limited to sales generated through electronic media), commissions received on vending machines or other coin operated devices, sales by any sublessee, concessionaire or licensee of Tenant or otherwise in the Leased Premises, and the retail value of any goods,

services, food or merchandise received by employees in lieu of earnings. Each sale upon installment or credit shall be regarded as a sale for the full price in the month during which the sale shall be made, irrespective of the time when Tenant shall receive payment from its customer. No deduction shall be allowed for uncollected or uncollectible credit accounts.

Gross Sales, however, shall not include (i) any sums collected and paid out by Tenant for any sales, use, occupation or retail tax imposed by any duly constituted governmental authority upon purchases from Tenant at retail and collectible by Tenant from purchasers; (ii) the amount of returns to shippers or manufacturers; (iii) the exchange of goods or merchandise between the stores of Tenant, if any, where such exchanges of goods or merchandise are made solely for the convenient operation of the business of Tenant and not for the purpose of consummating a sale which was made at, in, from or upon the Leased Premises and/or for the purpose of depriving Landlord of the benefit of a sale which otherwise would be made at, in, from or upon the Leased Premises; (iv) the amount of any cash or credit refund made upon any sale where the merchandise sold, or some part thereof, is thereafter returned by Tenant's customer and accepted by Tenant; or (v) sales of Tenant's fixtures not in the ordinary course of Tenant's business.

## ARTICLE 6
## ADDITIONAL RENT

In addition to the foregoing Minimum Guaranteed Rent, all other payments to be made by Tenant to Landlord pursuant to this Lease shall be deemed to be and shall become additional rent ("Additional Rent") hereunder whether or not the same be designated as such; and shall be due and payable on demand or together with the next succeeding installment of Minimum Guaranteed Rent, whichever shall first occur; and Landlord shall have the same remedies for failure to pay the same as for non-payment of Rent. Landlord, at its election, shall have the right to pay for or do any act which requires the expenditure of any sums of money by reason of the failure or neglect of Tenant to perform any of the provisions of this Lease, and in the event Landlord shall, at its election, pay such sums or do such acts requiring the expenditures of monies, Tenant agrees to pay Landlord, upon demand, all such sums, and the sums so paid by Landlord, together with interest thereon, shall be deemed Additional Rent and be payable as such.

## ARTICLE 7
## SECURITY DEPOSIT

Tenant, concurrently with the execution of this Lease, has deposited with Landlord a Security Deposit in the amount shown in Paragraph 1(Q) as a security for the performance of Tenant's obligations hereunder. If Tenant defaults with respect to any provision of this Lease including but not limited to the provisions relating to the payment of any Rent, Landlord, in its sole discretion, may elect to use, apply or retain all or any part of the Security Deposit for the payment of any Rent or any other sum due to Landlord hereunder or for the payment of any other loss or damage which Landlord may suffer by reason of Tenant's default which shall be applied as described in Article 3 above. If any portion of the Security Deposit is so used or applied, Tenant shall, within five (5) days after written demand therefore, deposit with Landlord an amount sufficient to restore the Security Deposit to its original amount and Tenant's failure to do so shall be a material breach of this Lease. Unless required by applicable law, Landlord shall not be required to keep the Security Deposit separate from its general funds and Tenant shall not be entitled to interest on such deposit. If Tenant shall fully and faithfully perform each provision of this Lease to be performed by it, the Security Deposit or any unused balance thereof shall be returned to Tenant, upon request, within thirty (30) days following Lease expiration and upon Tenant's vacating the Leased Premises and removing all of its property. The Security Deposit shall not constitute prepaid Rent or liquidated damages, but it may, at Landlord's sole option, be applied by Landlord toward the payment of the final month's Rent due under the Lease. Landlord may transfer the Security Deposit to a transferee of Landlord's interest in the Leased Premises or the Shopping Center whereupon Landlord shall be released from any further liability with respect to the Security Deposit.

## ARTICLE 8
## COMMENCEMENT OF TERM AND RENT

The Term of this Lease and the accrual of Rent hereunder shall commence on the Commencement Date set forth in Article 1(J). The Lease Term shall continue until the expiration of a period equal to the Lease Term (Article 1[I]) after the end of the month in which the Lease Term commences (except that if the Lease Term commences on the first day of a month, the Lease Term shall end after the expiration of a period equal to said Lease Term after such commencement). Except as expressly set forth herein to the contrary, Tenant's covenants and obligations as provided for in this Lease shall be effective and Tenant shall be fully bound thereby from and after the execution of this Lease by Landlord and Tenant.

Prior to the Commencement Date, Tenant and its agents, servants, employees, and contractors may enter the Leased Premises with Landlord's prior consent.  Tenant hereby agrees that none of such parties nor their work, equipment, or materials will interfere with any work or construction being or to be performed by Landlord or any other tenant of the Shopping Center; that Tenant will indemnify, defend and hold harmless Landlord of and from any and all liability, damage, costs, and expense (including attorneys' fees) for personal injury (including death) and/or property damage attributable directly or indirectly to any act or omission  of any one or more of such parties; that Tenant will pay all utility charges with respect to the Leased Premises which accrue on and after the date of the first such entry; and that such entry shall be subject to all terms, conditions, and covenants of this Lease other than those relating to the payment of Rent.  Prior to the commencement of construction Tenant shall provide Landlord with evidence of insurance coverage as defined in Article 20 (including, but not limited to, liability insurance) as well as evidence of worker's compensation coverage for any and all contractors involved in said construction.

Within ten (10) days after delivery of the Leased Premises to Tenant, Tenant shall commence construction of its improvements to the Leased Premises.  Tenant shall complete all of Tenant's improvements within one hundred eighty (180) days from the delivery of the Leased Premises to Tenant.  In the event Landlord notifies Tenant, in writing, that the Leased Premises are substantially completed and thereby delivers the Leased Premises to Tenant, and if Tenant fails to take possession on or before the Commencement Date, and/or to open the Leased Premises for business, fully fixtured, stocked and staffed within thirty (30) days after the Commencement Date, then Landlord shall have, in addition to any and all remedies herein provided, the option to immediately cancel and terminate this Lease and Tenant thereby shall forfeit any and all Security Deposit and prepaid Rent. In addition, in the event Tenant shall have failed to complete Tenant's Work and to have opened the Leased Premises for business on or before the Commencement Date, then all of Tenant's charges shall nevertheless commence on the Commencement Date at the rates specified in this Lease, except that Minimum Guaranteed Rent shall commence and be payable at the rate of one-fifteenth (1/15th) of the monthly amount of Tenant's initial Minimum Guaranteed Rent per day until Tenant shall open for business.

Upon Landlord's request, Tenant shall execute a document in recordable form setting forth the exact Commencement Date of the term of this Lease.  Fees relative to recordation of said document shall be borne by Landlord.   In any event, Tenant, at Landlord's request, will execute a letter confirming the actual Commencement Date of this Lease.

**ARTICLE 9**
**LEASED PREMISES**

For the purpose of this Lease the Leased Premises shall extend to the exterior faces of all walls or to the building line where there is no wall, or to the center line of those walls separating the Leased Premises from other leased premises in the Shopping Center, together with the appurtenances specifically granted in this Lease, but reserving and excepting to Landlord the use of the exterior walls and the roof and the right to install, maintain, use, repair and replace pipes, ducts, conduits and wires leading through the Leased Premises in locations which will not materially interfere with Tenant's use thereof and serving other parts of the Shopping Center.

**ARTICLE 10**
**USE OF PREMISES**

Tenant covenants and agrees to use the Leased Premises only for the permitted uses set forth in Article 1(R) and for no other use. Tenant shall use Tenant's Trade Name in the transaction of business in the Leased Premises.  Landlord may enforce this provision by cancellation of this Lease, injunctive or other equitable relief, and in addition to any other remedies available to Landlord, and in the event of any such legal or equitable action, Landlord shall, among other things, be entitled to recover attorneys' fees and costs.

Tenant covenants that it will not:

(A)    sell or display any merchandise, coin operated machines or solicit any sales or maintain any stands in the Common Areas or in front of the Leased Premises or of the line of buildings in the Shopping Center;

(B)    erect or maintain any barricade or scaffolding which may obscure the signs, entrances or show window of any other tenant in the Shopping Center, or tend to interfere with any such other tenant's business;

C)     create or maintain, or allow others to create or maintain, any nuisances, including without limiting the foregoing general language, loud noises, sound effects, offensive odors and smoke or dust in or about the Leased Premises;

(D)     place or maintain any signs in any parking areas serving the Leased Premises;

(E)     commit any waste or otherwise operate the Leased Premises in violation of Landlord's Shopping Center Sustainability Practices; or

(F)     maintain or allow to be maintained any excessively bright, changing, flashing or flickering lights or similar devices, the effect of which will be visible from the exterior of the Leased Premises.

Tenant shall not use the Leased Premises for any illegal trade or purpose. Tenant shall at all times comply in its occupancy and use with all applicable local ordinances, all applicable state and federal laws and regulations, and all reasonable rules and regulations prescribed from time to time by Landlord, including, without limitation, the Shopping Center Sustainability Practices. By execution of this Lease Landlord makes no representations to Tenant that the contemplated use of the Leased Premises meets local zoning and land use ordinances. Tenant shall refrain from permitting any nuisance or unlawful or immoral practice to be carried on within the Leased Premises. Tenant agrees to endeavor to keep the Leased Premises in such a manner so as not to disturb other tenants and/or customers and so as not to detract from the reputation and integrity of the Shopping Center. Tenant shall operate its business in a dignified manner and in accordance with high standards of store operation so as to maintain a character in keeping with the rest of the Shopping Center.

Tenant shall not, without Landlord's prior written consent, conduct within the Leased Premises, any fire sale, auction, or "going-out-of-business" sale.

Tenant's use of the Leased Premises shall be subject, at all times during the Lease Term, to Landlord's right to adopt, modify and/or rescind from time to time reasonable rules and regulations not in conflict with any of the express provisions herein governing the use of the parking areas, malls, walks, driveways, passageways, signs, exteriors of buildings, lighting and other matters affecting other tenants in and the general management and appearance of the Shopping Center of which the Leased Premises are a part. Tenant agrees to comply with all such rules and regulations.

Tenant covenants and agrees that it will not do or permit anything to be done in or upon the Leased Premises or bring in anything or keep anything therein which shall increase the rate of insurance on the Leased Premises or on the Shopping Center above the standard rate with a regular retail store located in the Leased Premises; and Tenant further agrees that in the event it shall do any of the foregoing, it will promptly pay to Landlord on demand any such increase resulting therefrom, which shall be due and payable as Additional Rent hereunder.

## ARTICLE 11
## CONTINUOUS OPERATION

Tenant agrees that the Shopping Center is an independent enterprise, that the Shopping Center's success is dependent upon the continued operation of Tenant's business for the benefit of all involved, and that maintenance of the character and quality is enhanced by the continued occupancy of the Leased Premises and the regular conduct of Tenant's business therein. Accordingly, and as an inducement to Landlord to execute this Lease, Tenant agrees to continuously conduct its business in 100% of the Leased Premises on the days and during the hours which are generally accepted as the times of operation of the Shopping Center businesses (the "Operating Hours"). Tenant agrees to keep its store adequately stocked with saleable merchandise and adequately staffed with employees in an effort to produce maximum Gross Sales and in compliance with all the terms of this Lease. If Tenant fails to continuously conduct its business in 100% of the Leased Premises during the Operating Hours, which failure is not cured within the applicable grace period, if any, Landlord may, at Landlord's sole option, cancel and terminate this Lease by sending Tenant written notice thereof, in which event Tenant shall immediately surrender the Leased Premises to Landlord. During any day when Tenant is not open for business at the Leased Premises during all of the hours when Tenant is required to be open as provided in this Article 11, subject to closing from time to time for federal and state holidays, then, without limitation to any rights and remedies provided to Landlord under this Lease or otherwise, the Minimum Guaranteed Rent due and payable under this Lease for such day shall be due and payable at a rate which is equal to two times the Minimum Guaranteed Rent rate otherwise due and payable.

## ARTICLE 12
### RETAIL RESTRICTION LIMIT

During the Lease Term, Tenant shall not, directly or indirectly through any affiliate, parent or subsidiary or any franchisee or licensee or principal or partner, engage in any business similar to or in competition with that for which the Leased Premises are let, within a radius of three (3) miles of the outside boundary of the Shopping Center without Landlord's prior written consent.

## ARTICLE 13
### CARE OF PREMISES

Tenant shall at all times keep the Leased Premises in a neat, orderly and safe condition.  Tenant agrees to use reasonable diligence to keep the sidewalks and outside areas immediately adjoining the Leased Premises free from ice and snow, and at all times broom-clean, free of trash, litter or obstructions of any kind.  Tenant agrees to clean adequately said Leased Premises as needed from time to time during the term of this Lease, and Tenant will keep clean the inside and outside of all glass in the doors and windows of the Leased Premises.  Tenant will maintain the Leased Premises in a sanitary condition and free of pets, animals, insects, rodents, termites, vermin and other pests.  Tenant shall promptly remove any mold from the Leased Premises.  Tenant agrees to adequately heat and cool the Leased Premises, and Tenant shall at all times keep the Leased Premises at a temperature sufficiently high to prevent freezing of water pipes and fixtures.

Tenant shall, in accordance with governmental regulations and the Shopping Center Sustainability Practices, at its expense, including any and all governmental fees, provide for the regular removal of all trash, rubbish and garbage from the Leased Premises.  Landlord reserves the right to designate, from time to time, a third-party trash collection/recycling vendor for the Shopping Center, or portions thereof, in which event Tenant shall, as Landlord shall so designate, either (i) reimburse Landlord, as Additional Rent, based on Tenant's proportionate share as it relates to the square footage of gross leasable areas of all tenants utilizing the dumpster or container service (not the gross leasable area of the entire Shopping Center) or on such other basis as Landlord shall reasonably determine, or (ii) Tenant shall contract directly with such designated vendor for such services and pay such vendor directly, in lieu of Landlord reimbursement.  Tenant shall not permit the burning of any rubbish or garbage in or about the Shopping Center.  If garbage and rubbish is to be accumulated by dumpsters, canisters or containers on Shopping Center property, Landlord shall have the right to reasonably regulate the method of accumulation for health and aesthetic purposes.  Tenant shall abide by any reasonably promulgated regulations.  Tenant further agrees that Tenant shall receive and deliver goods and merchandise only in the manner, at such times, and in such areas as may be designated by Landlord.

## ARTICLE 14
### COMMON AREAS AND PARKING

All Common Areas in or about the Shopping Center shall be subject to the exclusive control and management of Landlord.

Tenant and its concessionaires, officers, employees, contractors, agents, customers and invitees shall have the non-exclusive right, in common with Landlord and all others to whom Landlord has or may hereafter grant rights, to use the Common Areas as designated from time to time by Landlord subject to such reasonable rules and regulations as Landlord may from time to time impose, including the designation of specific areas in which cars owned by Tenant, its concessionaires, officers, employees, contractors and agents must be parked.  Tenant agrees to abide by such rules and regulations and to use its best efforts to cause its concessionaires, officers, employees, contractors, agents, customers and invitees to conform thereto.  Landlord may at any time temporarily close parking areas; and Landlord may do such other acts in and to the Common Areas as in its judgment may be desirable.  Tenant shall, upon request, furnish to Landlord the license numbers of the cars operated by Tenant and its concessionaires, officers and employees.  If Tenant or its concessionaires, officers or employees fail to park their cars or other vehicles in Common Areas designated by Landlord, Landlord shall have the right in its sole discretion to (i) charge Tenant TEN DOLLARS ($10.00) per day per car parked in any Common Areas other than those designated, and/or (ii) have such cars or other vehicles physically removed from the Shopping Center at Tenant's expense, without any liability whatsoever to Landlord.  Tenant shall not at any time interfere with the rights of Landlord and other tenants, its and their concessionaires, officers, employees, contractors, agents, customers and invitees, to use any part of the parking areas and other Common Areas.  Neither Tenant nor Tenant's employees, contractors, concessionaires or agents shall solicit business in the parking or other Common Areas or distribute any handbills or other advertising matter in such areas or place any such handbills or advertising matter in or on any automobiles parked therein without Landlord's written consent.

Anything in this Lease to the contrary notwithstanding, Landlord shall have the right at any time during the term of this Lease to alter, modify, change or move the parking facilities or other Common Areas within the Shopping Center as now constituted or planned or hereafter enlarged or diminished.  It is expressly understood and agreed that the designation or use from time to time of portions of the Shopping Center as Common Areas shall not restrict Landlord's use of such areas for buildings, structures, or for such other purpose as Landlord shall determine.

Landlord reserves the right to grant to third persons the non-exclusive right to cross over and use in common with Landlord and all tenants of the Shopping Center or the Common Areas as designated from time to time by Landlord.

## ARTICLE 15
## TAX RESPONSIBILITIES

Tenant's responsibility for real estate taxes, assessments, business license fees and other charges which may be levied, assessed or charged against the Shopping Center is described in Article 17.

Tenant shall pay, in a timely manner, all operating license fees for the conduct of its business and ad valorem and other taxes levied upon its trade fixtures, personal property, inventory and stock of merchandise as well as all sales taxes attributable to the payment of Tenant's Rent and/or Additional Rent.  Said obligation of Tenant shall survive any termination or expiration of this Lease and shall continue until  the applicable taxing authority removes such taxes from the applicable tax records.

Upon Tenant's failure to make payment of its tax or lien responsibilities under this Article, Landlord shall have the right, but not the obligation, to make payment on behalf of Tenant, and such payment shall be deemed to be Additional Rent due for the month in which the taxes are paid, and shall become due and payable upon ten (10) days written notice to Tenant evidencing such payment by Landlord.

Tenant's obligations hereunder shall survive the expiration or earlier termination of this Lease.

## ARTICLE 16
## MECHANIC'S LIEN

If by reason of any alteration, repair, labor performed or materials furnished to the Leased Premises for or on behalf of Tenant any mechanic's or other lien shall be filed, claimed, perfected or otherwise established as provided by law against the Leased Premises, Tenant shall discharge or remove the lien by bonding or otherwise, within ten (10) days after notice from Landlord to Tenant of the filing of same.  In the event Tenant fails to so discharge or remove such lien as provided for herein and within such time, Landlord may, but shall not be obligated to cause such lien to be removed or bonded over and Tenant agrees to pay to Landlord the costs Landlord incurs as a result, as Additional Rent hereunder.

Tenant's obligations hereunder shall survive the expiration or earlier termination of this Lease.

## ARTICLE 17
## PAYMENTS OF PRO RATA SHARE OF EXPENSES, TAXES AND INSURANCE

All costs and expenses of every kind and nature paid or incurred by Landlord in its discretion in the operation,  maintenance, repair, policing, managing and securing of the Shopping Center, including, without limitation, those related to any Shopping Center Sustainability Practices (herein referred to as the "Expenses") shall be prorated as hereinafter set forth.  The Expenses shall include (but shall not be limited to) water and sewer charges; utilities system installation charges and assessments; fees for required business licenses and permits; costs of supplies; costs for utilities serving the Shopping Center (including on and off-site utilities and facilities such as sewer lift stations, retention/detention ponds, drainage facilities, roadways, driveways, and all expenses relating thereto); costs for security; costs for Common Area improvements; costs for maintaining, repairing and replacing elevators and stairways; any costs or expenses which Landlord has elected to amortize over a period of years until such cost or expense is fully recovered (including, without limitation, costs directly related to the Shopping Center Sustainability Practices); costs for roof maintenance, repair and replacement; legal and accounting costs not related to lease negotiations or evictions; solid waste assessments; costs of operation and maintenance of lift stations; costs of equipping, cleaning, lighting, traffic control, striping, resurfacing, resealing, snow removal and maintaining all parking facilities; reserves for repairs, maintenance, and replacement of Shopping Center facilities; costs for painting exterior walls; costs for maintaining and monitoring fire sprinkler systems and fire, life safety and other alarms; costs for the maintenance, planting,

-10-

replanting and replacement of all landscaping and gardening and the maintenance of sprinkler or irrigation systems for such landscaping or gardening.

The term "Insurance" is hereby defined to mean all costs and expenses of every kind associated with insuring the Shopping Center or the Common Areas including, but not limited to, "All Risk" property insurance including the perils of flood and earthquake, rent interruption insurance, all liability insurance, workers' compensation insurance, endorsements in order to repair, replace and re-commission the Shopping Center in order to promote the Shopping Center Sustainability Practices, and other insurance coverages deemed reasonable and necessary by Landlord, and/or its lender and Landlord's share of any deductible or co-insurance in connection with a loss.

The term "Taxes" is hereby defined to mean all general and special taxes, including existing and future assessments for road, sewer, utility and other local improvements and other governmental charges which may be lawfully charged, assessed, or imposed upon all or any portion of the Shopping Center on both land and any or all improvements contained therein.  Landlord shall pay, or cause to be paid, before the same become delinquent, all Taxes, provided however, that if authorities having jurisdiction assess Taxes on the Shopping Center and/or the improvements contained therein which Landlord deems excessive, Landlord may defer compliance therewith to the extent permitted by the law so long as the validity or amount thereof is contested by Landlord in good faith and so long as Tenant's occupancy of the Leased Premises is not disturbed or threatened. In the event tax abatements, credits, reductions or the like (the "Tax Credit") are received as a result of the Shopping Center Sustainability Practices, and Tenant has not reimbursed Landlord for the expenses incurred with regard to the same, Tenant's share of Taxes shall be calculated as if no such Tax Credit was received.

In every case, Taxes shall be adjusted to take into account any abatement or refund thereof paid to Landlord, less all of Landlord's costs of securing such abatement or refund (Landlord having the sole right to contest Taxes).  If Landlord shall elect to contest such Taxes, Landlord shall be entitled to bill Tenant for its said Pro Rata Share (as hereinafter defined) of the costs and expenses thus incurred by Landlord as and when the same are incurred, and the same shall constitute part of such Taxes.  To the extent that Landlord has so billed and received from Tenant payment of such costs and expenses, the same shall not be deducted as aforesaid from the abatement or refund, if any, ultimately received with respect thereto.

As Additional Rent, Tenant agrees to pay its Pro Rata Share, as defined below, of (i) all Expenses, (ii) all Taxes (including real estate taxes and any cost incurred due to the reasonable appeal of same), assessments, and all other charges levied against the Shopping Center and its Common Areas to include, but not be limited to, all applicable wage, unemployment, social security and personal property taxes and assessments, (iii) all Insurance, and (iv) an administrative fee of fifteen percent (15%) of an amount equal to the total amount of all of such Expenses.

The term "Pro Rata Share" as used in this Article shall be calculated, after deducting contributions made by Major Tenants, by multiplying the applicable charge for the calendar year then under consideration, by a fraction, the numerator of which shall be the number of gross square feet contained in the Leased Premises and, except as provided in the next paragraph, the denominator of which shall be the aggregate number of gross square feet of building space in the Shopping Center on which such charges were calculated.  However, the denominator of the fraction shall not include any space within the buildings now or hereafter constructed designated as Major Tenant.  The term "Major Tenant" for purposes of this Lease shall refer to any tenant occupying more than ten thousand (10,000) square feet of building area.

In the event any other tenant self-insures, and/or is taxed separately, and/or is responsible, under terms of its lease, for payment of specific expenses and therefore such tenant does not make a contribution to Landlord for reimbursement of other Expenses, Insurance or Taxes incurred by Landlord, then Tenant's Pro Rata Share of any such other Expenses, Taxes, or Insurance shall be determined by multiplying the amount of such other Expenses, Taxes or Insurance by the proportion of floor area that the Leased Premises bears to the floor area of all tenants who actually contribute to payment of such  Expenses, Taxes or Insurance (excluding the square footage of the floor area from the denominator  of any tenants who do not so contribute under the terms of such tenants' leases).

Tenant's Pro Rata Share of costs and expenses as above set out shall be paid monthly in advance based upon reasonable estimates for such charges made by Landlord.  An adjustment shall be made for each of said charges on a calendar year basis when the actual costs from the preceding year and reasonable estimates for the upcoming year have been determined.  Should Tenant's Lease Term for the Leased Premises end prior to a full calendar year, its Pro Rata Share of costs and expenses shall be prorated on a monthly basis for such partial calendar year.

In the event the annual reconciliation reveals a balance due from Tenant, Landlord will invoice Tenant for the remaining balance of its Pro Rata Share of costs and expenses. Tenant shall have thirty (30) days from the date of such invoice to pay Landlord the balance due. Should the annual reconciliation reveal an overpayment by Tenant, Landlord shall notify Tenant of such overpayment and apply a credit to Tenant's account. Tenant, upon notification from Landlord, may deduct the overpayment from its next Rent due. Should there be an overpayment by Tenant during the last Lease Year then Landlord shall notify Tenant of such overpayment, and upon Tenant's request, refund any monies due to Tenant forty-five (45) days after the Lease expiration date provided no other charges due from Tenant are outstanding. Tenant's failure to object to any statement, invoice or billing rendered by Landlord within a period of ninety (90) days after Tenant's receipt thereof shall constitute Tenant's acquiescence with respect thereto and shall render such statement, invoice or billing an account between Landlord and Tenant.

Tenant's obligations hereunder shall survive the expiration or earlier termination of this Lease.

**ARTICLE 18**
**CONSTRUCTION OF IMPROVEMENTS**

Landlord represents that any work required of it shall be performed in a good workmanlike manner and shall include those items designated as "Landlord's Work" attached hereto and marked as **Exhibit "B"**.

Tenant, at its sole cost and expense, shall perform and construct, in a good and workmanlike manner and in accordance with all applicable laws and regulations, those items designated as "Tenant's Work", attached hereto as **Exhibit "C"**.

**ARTICLE 19**
**FIXTURES AND INTERIOR ALTERATIONS**

Except for Tenant's Work (as described on **Exhibit "C"**) and the installation of unattached moveable trade fixtures which may be installed without drilling, cutting or otherwise defacing the Leased Premises, Tenant shall not make any alterations or modifications to the Leased Premises without the prior written consent of Landlord which consent shall be in Landlord's sole discretion. Any alterations or improvements in and to the Leased Premises shall not adversely affect the structural integrity of the Leased Premises or reduce its value. If approval is given, Tenant shall make such alterations, additions or improvements in a good workmanlike manner and in accordance with all requirements of municipal and other governmental authorities and the Shopping Center Sustainability Practices. Under no circumstances shall Tenant be allowed to make structural alterations, additions, or improvements or penetrate the roof or exterior walls of the Leased Premises without the expressed prior written consent of Landlord. It is expressly understood that the use of the roof above the Leased Premises and exterior walls are reserved to Landlord. All permanent improvements shall belong to Landlord and become a part of the Leased Premises upon termination or expiration of this Lease.

Tenant shall be responsible for obtaining at its sole expense all necessary permits and approvals from any governmental authority related to Tenant's use and Tenant's Work on the Leased Premises. Prior to applying for each such permit and approval, Tenant shall submit the plans for the same to Landlord (to ensure, among other things, compliance of the same with Shopping Center Sustainability Practices then in effect) and Tenant shall not submit any such application to any governmental authority without Landlord's prior approval. Tenant shall apply for such permits and approvals within ten (10) days after delivery of possession of the Leased Premises to Tenant.

Any unattached moveable trade fixtures installed by Tenant shall at all times be and remain the property of Tenant, and Tenant shall have the right to remove all or any part of the same from the Leased Premises at any time so long as Tenant is not in default of the terms and provisions of this Lease; provided, Tenant shall repair or reimburse Landlord for the cost of repairing any damage to the Leased Premises resulting from the installation or removal of such items.

All alterations, additions, and improvements made in and to the Leased Premises, including all light fixtures and all floor covering that is cemented, attached, tacked, adhesively fixed, stapled, or in any way installed or fixed to the floor, and all other fixtures (other than trade fixtures) which are installed in the Leased Premises shall remain in and be surrendered with the Leased Premises and shall become the property of Landlord at the expiration or sooner termination of this Lease.

## ARTICLE 20
### INDEMNIFICATION AND PUBLIC LIABILITY INSURANCE

Tenant agrees to indemnify, defend with counsel acceptable to Landlord and save harmless Landlord, Landlord's property manager and any holder of a mortgage and/or lien holder on all or any portion of the Shopping Center from and against all claims of whatever nature arising from any act, omission or negligence of Tenant, or Tenant's contractors, licensees, agents, servants, employees, customers or invitees, or arising from any accident, injury, or damage whatsoever caused to any person, or to the property of any person, or from any violation of applicable law including, without limitation, any law, regulation, or ordinance concerning trash, hazardous materials, or other pollutant occurring from and after the date that possession of the Leased Premises is delivered to Tenant and until the end of the term hereof in or about the Leased Premises, or arising from any accident, injury or damage occurring outside of the Leased Premises, including, without limitation, the Common Areas, where such accident, damage or injury results or is claimed to have resulted from an act or omission on the part of Tenant or Tenant's contractors, licensees, agents, servants, employees, customers or invitees. This indemnity and hold harmless agreement shall include indemnity against all costs, expenses and liabilities incurred in or in connection with any such claim or proceeding brought thereon, and the defense thereof and shall survive the expiration or earlier termination of this Lease.

Tenant agrees to carry, at its own expense, Commercial General liability insurance coverage, on an "Occurrence Form" on the Leased Premises with a company qualified to transact business in the state in which the Leased Premises are located, stipulating limits of liability of not less than $1,000,000 each occurrence/$2,000,000 general aggregate combined single limit or such higher limits as Landlord may from time to time request, provided such higher limits are then customarily carried on comparable first-class shopping centers. Landlord, Landlord's property manager, and Landlord's lenders shall be named as additional insureds on such coverage, and a certificate of such coverage from the insurer providing thirty (30) days notice to Landlord prior to cancellation or termination shall be furnished to Landlord. If Tenant fails to comply with the above requirement, Landlord may, but shall not be obligated to under any circumstance, obtain such insurance and keep the same in effect, and Tenant shall pay Landlord, as Additional Rent, the premium cost thereof upon demand (Landlord's election to obtain or not to obtain such insurance shall not affect Tenant's indemnity obligation to Landlord under the foregoing paragraph).

Tenant, and or its contractor, shall also maintain "Builders Risk", Commercial General liability, workers compensation and employers liability insurance with respect to any and all of Tenant's construction and alteration activities, naming Landlord, Landlord's lenders and Landlord's manager as additional insureds, in such amounts and on such terms as are satisfactory to Landlord and customary for like construction, stipulating limits of liability of not less than $1,000,000 per occurrence/$2,000,000 general aggregate combined single limit for property damage and personal injury or such higher limits as Landlord may from time to time request, provided such higher limits are then customarily carried on comparable first-class shopping centers. Workers compensation coverage shall be provided with statutory limits, and their employers liability insurance limits not less than $500,000 each accident/$500,000 each employee/$500,000 policy limit. Prior to commencing any construction work, Tenant shall provide Landlord with copies of certificate(s) reflecting such insurance coverage from the insurer providing thirty (30) days notice to Landlord prior to cancellation or termination.

Except to the extent caused by the acts or omissions of Tenant or its agents, employees, contractors, servants, licensees, invitees or customers, Landlord agrees to indemnify and save harmless Tenant from any claim or loss by reason of an accident or damage to any person or property happening on any Common Area (including without limitation, parking areas, sidewalks, ramps and service areas) of the Shopping Center, and further agrees to carry public liability insurance coverage on all Common Areas with a company qualified to transact business in the state in which the Leased Premises are located, stipulating limits of liability of not less than $1,000,000.00 each occurrence/$2,000,000 general aggregate combined single limit coverage. Notwithstanding any language to the contrary, Tenant shall have no rights in said policy(s) maintained by Landlord and shall not, by reason of reimbursement, be entitled to be named an additional insured thereunder.

## ARTICLE 21
### NON-LIABILITY; GENERAL DAMAGE AND FIRE DAMAGE

All property kept, stored or maintained in or on the Leased Premises shall be so kept, stored or maintained at the sole risk of Tenant.

Notwithstanding any other provision in this Lease to the contrary, Landlord shall not be liable to Tenant, its subtenants or concessionaires or persons permitted by Tenant to occupy or do business in the Leased Premises for any damage to such property of Tenant, its subtenants or concessionaires or persons permitted by

Tenant to occupy or do business in the Leased Premises. Landlord and Tenant have agreed to allocate the risk of loss to all such property of Tenant, its subtenants or concessionaires or persons permitted by Tenant to occupy or do business in the Leased Premises by Tenant obtaining (or causing subtenants or concessionaires or persons permitted by Tenant all  the premises to obtain) insurance insuring the full replacement costs of all such property of Tenant, its subtenants or concessionaires or persons permitted by Tenant to occupy or do business in the Leased Premises, which insurance shall include a waiver of subrogation provision against Landlord for any loss or claim paid under such insurance caused by the act or negligence of Landlord. Therefore, Landlord shall not have any liability to Tenant, its subtenants or concessionaires or persons permitted by Tenant to occupy or do business in the Leased Premises for loss of any property of Tenant, its subtenants or concessionaires or persons permitted by Tenant to occupy or do business in the Leased Premises even in the case of Landlord's fault or negligence.

Except as otherwise provided by applicable law and in addition to the provisions of the preceding paragraph, Landlord shall not be liable to Tenant for any damage to property of Tenant or others located in or on the Leased Premises, nor for the loss of, or damage to, any property of Tenant or of others by theft or otherwise nor shall Landlord be liable for any injury or damage to persons or property resulting from fire, explosion, falling plaster, steam, gas, electricity, water, rain or snow, or leaks from any part of the Leased Premises or from the pipes, appliances or plumbing works, or from any other place, or from dampness, or water being upon or coming through the roof, exterior walls (including windows and doors), skylight, vent, trapdoor, or from any other cause whatsoever.  Tenant shall notify Landlord immediately in writing upon the discovery of any water infiltration in or about the Leased Premises or Common Areas.  Further, Landlord shall not be liable for any damage caused by other tenants or persons in or about the Leased Premises, or for damage caused by operations of any third party contractors, whether private, public, or quasi-public.

In addition, Landlord shall not be liable to the extent of Tenant's insurance coverage for any loss or damage to any person or property even if due to the negligence or fault of Landlord or the failure of Landlord to perform under this Lease, except as may be otherwise provided by applicable law.

Should the Leased Premises be partially destroyed by fire or other casualty so that at least  50% of the floor area of the Leased Premises may be occupied by Tenant, Landlord will with reasonable diligence, after receiving all necessary permits and approvals and insurance proceeds sufficient to cover the cost of restoration, repair or restore the same so that thereafter the Leased Premises shall be substantially in the same condition as originally delivered to Tenant; provided, Landlord shall not have any obligation to restore (and Tenant shall be obligated to restore) the trade fixtures, inventory, shelving, equipment and other personal property of Tenant located within the Leased Premises and damaged by such loss.   Notwithstanding the foregoing, if (i) such damage occurs in the last two (2) years of the Lease Term and Tenant does not exercise any renewal options available to it, or negotiate a new lease for at least five (5) years; or (ii) any lender of Landlord does not permit the use of insurance proceeds for such repair or restoration, Landlord may elect not to rebuild and cancel this Lease.

Should the Leased Premises be so extensively damaged by fire or other casualty so that more than 50% of the floor area of the Leased Premises is destroyed or rendered untenantable, then Landlord may, at Landlord's sole discretion, at its expense, restore or rebuild the same so that thereafter the Leased Premises shall be substantially in the same condition as originally delivered to Tenant.  If Landlord elects not to rebuild the Leased Premises, either Landlord or Tenant may elect to terminate this Lease by sending written notice thereof to the other party within a reasonable time after Landlord has made such determination.

Tenant agrees that during any period of reconstruction or repair of the Leased Premises, it will continue the operation of its business within the Leased Premises to the extent practicable.  During the period from the occurrence of a casualty until Landlord's repairs are completed, the Minimum Guaranteed Rent shall be reduced and abated in proportion to the amount of floor area of the Leased Premises which is rendered untenable as a result of such casualty; provided, however, that if such damage or destruction is caused by the intentional or negligent acts or omissions of Tenant, its assignees, sublessees, servants, agents, employees, contractors, invitees, licensees, or concessionaires, then, and in that event, the Minimum Guaranteed Rent shall not abate. Tenant shall not be entitled to and hereby waives, releases, and relinquishes any and all claims against Landlord for any compensation or damage for loss of use of all or any part of the Leased Premises or for any inconvenience or annoyance occasioned by any such damage, destruction, repairs, or restoration of the Leased Premises.

Unless this Lease is terminated as provided in this Article 21, if the Leased Premises shall be damaged or destroyed by fire or other casualty, then Tenant shall:  (i) repair and restore all portions of the Leased Premises not required to be restored by Landlord pursuant to this Article 21 to substantially the condition which

such portions of the Leased Premises were in at the time of such casualty; (ii) equip the Leased Premises with trade fixtures and all personal property necessary or proper for the operation of Tenant's business; and (iii) open for business in the Leased Premises as soon thereafter as possible.

If, however, the Shopping Center shall be substantially damaged or destroyed by fire or casualty, irrespective of whether or not the Leased Premises are damaged or destroyed, Landlord shall promptly restore, to the extent originally constructed by Landlord (consistent, however, with zoning laws and building codes then in existence), so much of such Shopping Center as was originally constructed by Landlord to substantially the condition thereof at the time of such damage, unless Landlord, within a reasonable time after such loss but no later than sixty (60) days, gives notice to Tenant of Landlord's election to terminate this Lease.  If Landlord shall give such notice, then anything in this Article 21 to the contrary notwithstanding this Lease shall terminate as of the date of such notice with the same force and  effect as if such date were the date originally established as the expiration date hereof.

### ARTICLE 22
### HAZARD INSURANCE BY LANDLORD

Landlord will carry and maintain or cause to be maintained property insurance, including the perils of flood and earthquake, with such deductibles and co-insurance provisions as Landlord may determine, plus all endorsements and other insurance coverages deemed reasonable and necessary by Landlord, and or its Lender, on the Leased Premises and other buildings in the Shopping Center as Landlord shall deem advisable, but specifically excluding any property or improvements made by or belonging to Tenant.  If during the term of this Lease, the Leased Premises are used for any purpose or in any manner which causes an increase in the rates of such insurance, Tenant shall pay to Landlord, as Additional Rent, the additional premium caused thereby upon demand.  Notwithstanding language to the contrary, Tenant shall have no rights in said policy(s) maintained by Landlord and shall not, by reason of reimbursement, be entitled to be named an additional insured thereunder.

### ARTICLE 23
### MUTUAL WAIVER OF SUBROGATION

Notwithstanding any provision herein to the contrary, Landlord and Tenant mutually agree that with respect to any loss which is covered by property or casualty insurance then being carried by them, respectively, the one carrying such insurance and suffering said loss releases the other of and from any and all claims with respect to such loss, and they further mutually agree that their respective insurance companies shall have no right of subrogation against the other on account thereof (and each party shall cause each property or casualty insurance policy carried by it to provide for waivers of any right of subrogation that the insurer of such party may acquire against the other party hereto with respect to any such losses,  even if such loss or damage shall have been caused by the fault or negligence of the other party, its employees or agents. Landlord and Tenant acknowledge that the parties have chosen to allocate the risk of loss pursuant to the insurance provisions of this Lease and that it is fair and equitable to both parties in light of the insurance provided that a party should be released from liability for its own fault or negligence in causing loss to the other party's property. Tenant shall cause all its subtenants or concessionaires or persons permitted by Tenant to occupy or do business in the Premises to maintain property and casualty insurance providing waivers of subrogation against Landlord for any loss covered by such insurance in the same manner as Tenant is required to provide under this provision.

Landlord's and Tenant's obligations hereunder shall survive the expiration or earlier termination of this Lease.

### ARTICLE 24
### DEFAULT BY TENANT

(A)    Tenant shall be in monetary default if it fails:

(i)    to pay when due each installment of Minimum Guaranteed Rent;

(ii)    to pay when due Additional Rent.

(B)    In the event Tenant is in monetary default, it shall have a grace period of ten (10) days to cure such default after Landlord shall have forwarded Tenant written notice thereof;   provided however, if Landlord shall have forwarded to Tenant a notice of such default, even though the same shall have been cured and this Lease not terminated, and within twelve (12) months from the date which said notice of default has been forwarded by Landlord to Tenant, Tenant shall

-15-

again be in monetary default, the same shall be deemed an event of default without any notice or grace period.

(C)    Tenant shall be in non-monetary default if it shall fail to keep or shall violate any other conditions, stipulations, or agreements contained herein on the part of Tenant to be kept and performed.

(D)    In the event Tenant is in non-monetary default, it shall have a grace period of twenty (20) days to cure such default after Landlord shall have forwarded Tenant written notice thereof; provided however, if Landlord shall have forwarded to Tenant a notice of such default, even though the same shall have been cured and this Lease not terminated, and within twelve (12) months from the date which said notice of default has been forwarded by Landlord to Tenant, Tenant shall again be in non-monetary default, the same shall be deemed an event of default without any notice or grace period.

(E)    In the event Tenant is in either monetary or non-monetary default beyond any applicable grace period, Landlord, at its option may either

   (i)    terminate this Lease in which event Tenant shall immediately surrender the Leased Premises to Landlord, or

   (ii)    re-enter and take possession of the Leased Premises and remove Tenant, Tenant's agents, any subtenants, any licensees, any concessionaires and any invitees, and any of its or their property therefrom and, if Landlord so elects, make such alterations and repairs as may be necessary to relet the Leased Premises, place "for lease" signs within the Leased Premises and relet the Leased Premises or any part thereof, as the agent of Tenant, at such rent and for such term and subject to such terms and conditions as Landlord may deem advisable and receive the rent therefor.  Upon each such reletting all Rent received by Landlord from such reletting shall be applied, first, to the payment of any indebtedness other than Rent due hereunder from Tenant to Landlord; second, to the payment of any loss and expenses of such reletting, including brokerage fees and attorneys' fees and costs of such alterations and repairs; third, to the payment of Rent and other charges due and unpaid hereunder, and the residue, if any, shall be held by Landlord and applied in payment of future Rent as the same may become due and payable hereunder, and Tenant agrees to pay to Landlord on demand any deficiency that may arise by reason of such reletting.   Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease for such previous breach.

   The rights of Landlord upon default by Tenant, shall in no way preclude Landlord from pursuing any other legal remedies.

(F)    Pursuit of any of the remedies herein provided shall not preclude pursuit of any of the other remedies herein provided or any other remedies provided at law or in equity, nor shall pursuit of any remedy herein provided constitute a forfeiture or waiver of any Rent due to Landlord hereunder or of any damages accruing to Landlord by reason of the violation of any of the covenants and provisions herein contained.  Forbearance by Landlord to enforce one or more of the remedies herein provided upon an event of default shall not be deemed or construed to constitute a waiver of such default.  No delay or omission by Landlord to exercise any right or power accruing upon any noncompliance or default by Tenant with respect to any of the terms hereof, shall impair any such right or power or be construed to be a waiver thereof.  Every such right or power may be exercised at any time during the continuation of this Lease.  It is further agreed that a waiver by Landlord of any of the covenants and agreements hereof to be performed by Tenant shall not be construed to be a waiver of any subsequent breach thereof or of any covenants or agreements herein contained.

(G)    Re-entry and removal may be effectuated by summary dispossession proceedings, by any suitable action or proceedings at law, by force, or otherwise, and Landlord shall not be liable for prosecution or any claim of damages therefore.  Landlord shall be entitled to the benefits of all provisions of law respecting the speedy recovery of lands and tenements held over by Tenant or proceedings in forcible entry and detainer.  Landlord shall not be liable in any way in connection with any action it takes pursuant to this section.  Tenant's liability under the terms of this Lease

shall survive Landlord's re-entry, the institution of summary proceeding, and the issuance of any warrants with respect thereto.

(H)     Should Landlord at any time terminate this Lease for any breach, in addition to any other remedies Landlord may have, Landlord may recover from Tenant all damages Landlord may incur by reason of such breach, including the cost of recovering the Leased Premises, reasonable attorneys' fees, and the worth at the time of such termination of the excess, if any, of the amount of Rent and charges equivalent to Rent reserved in this Lease for the remainder of the Lease Term over the then reasonable rental value of the Leased Premises for the remaining portion of the Lease Term, all of which amounts shall be immediately due and payable from Tenant to Landlord.  In determining the Rent which would be payable by Tenant hereunder, subsequent to default, the annual Minimum Guaranteed Rent for each year of the unexpired term shall be equal to the average Minimum Guaranteed Rent paid by Tenant from the Commencement Date to the time of default, or during the preceding two (2) calendar years, whichever period is shorter.

(I)     If, because of any breach or default by Tenant in Tenant's obligations hereunder, it shall become necessary for Landlord to employ an attorney to enforce or defend any of Landlord's rights or remedies hereunder, Tenant agrees to pay the actual attorneys' fees incurred by Landlord in connection with such.

### ARTICLE 25
### WAIVER OF TRIAL BY JURY

To the extent permitted by law, Landlord and Tenant hereby mutually waive any right to trial by jury in any action, proceeding or counterclaim brought by either party on any matters whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant,  the Leased Premises, and/or the Shopping Center.

### ARTICLE 26
### LIEN OF LANDLORD FOR RENT, TAXES AND OTHER SUMS

Landlord shall have, and Tenant hereby grants, a security interest in any furnishings, equipment, fixtures, inventory, accounts receivable or other personal property of any kind belonging to Tenant, or the equity of Tenant therein, which may be placed on the Leased Premises and also upon all proceeds of any insurance which may accrue to Tenant by reason of destruction or damage to any such property.  The security interest is granted for the purpose of securing the payment of Rent, assessments, charges, penalties and damages herein covenanted to be paid by Tenant hereunder.  Upon default or breach of any covenants of this Lease, Landlord shall have all remedies available under the Uniform Commercial Code enacted in the state where the Leased Premises are located including, but not limited to, the right to take possession of the above-mentioned property and dispose of it by sale in a commercially reasonable manner.  Tenant hereby agrees to sign a financing statement upon a request to do so by Landlord, for the purpose of serving notice to third parties of the security interest herein granted.  The security interest granted to Landlord herein is given in addition to Landlord's statutory lien and shall be cumulative thereto.

### ARTICLE 27
### DEFAULT BY LANDLORD

Should Landlord be in default under any of the terms of this Lease, Tenant shall give Landlord prompt written notice thereof in the manner specified in Article 41 and Tenant shall allow Landlord a reasonable length of time (in any event, not less than thirty (30) days from the date of such notice) in which to cure such default.

A default hereunder shall be deemed cured if Landlord in good faith commences to cure the same within thirty (30) days after receipt of notice and thereafter continuously and with reasonable diligence proceeds to actually complete the cure of such default.

If Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed, Tenant may not terminate the Lease, and Tenant's sole remedy shall be money damages which shall be (except as otherwise provided herein) payable by Landlord to Tenant in the ordinary course of business pursuant to Florida law. If Landlord is a partnership, none of the partners comprising such partnership shall be individually liable for any deficiency.

Notwithstanding anything herein contained to the contrary, it is specifically understood and agreed that there shall be no personal liability for any deficiency or otherwise on the part of Landlord, its agents, representatives, employees, or any of its constituent members, partners or shareholders, or their respective legal representatives, heirs, successors and assigns as the case may be, with respect to any of the terms, provisions, covenants and conditions of this Lease or otherwise, and that Tenant shall look solely to the estate, property and equity of Landlord (or such successor in interest) in the Shopping Center and subject to the prior rights of any mortgagees for the satisfaction of each and every remedy of Tenant in the event of any breach of any of the terms, provisions, covenants and conditions of this Lease to be performed by Landlord, or in the event of any other claim which Tenant may allege against Landlord, its agents, representatives, employees, constituent members, partners or shareholders, or their respective legal representatives, heirs, successors and assigns, which exculpation of personal liability shall be absolute and without exception.  In the event of the sale or other transfer of Landlord's right, title and interest in the Leased Premises or the Shopping Center, Landlord shall be released from all liability and obligations hereunder.

### ARTICLE 28
### TENANT'S REPAIRS

Tenant agrees to keep the interior of the Leased Premises, including, but not limited to, all windows, doors, window and door hardware, glass, plate glass, electrical, plumbing, floor covering, interior walls and ceiling, in good condition and repair, and agrees to replace damaged items, and shall make all necessary repairs, except repairs which are the express responsibility of Landlord hereunder  or which are made necessary by reason of fire and other unavoidable casualties to the extent covered by Landlord's property insurance, and excepting reasonable wear and tear.  Notwithstanding any provision of this Lease to the contrary, within the repair and replacement responsibilities of Tenant shall be included any and all maintenance, repairs or replacements to heating, ventilating and air conditioning equipment (the "HVAC"), including heating and air conditioning units, duct work, fans, motors, registers and grilles.  Tenant agrees to procure and maintain an HVAC maintenance contract with a reputable contractor, providing for the maintenance and repair of the HVAC according to manufacturer's specifications and including the replacement of filters at a minimum of four (4) times per year. The HVAC maintenance contract will stipulate at least quarterly maintenance service.  Such HVAC maintenance contract must be with a licensed and insured contractor acceptable to Landlord, or if Landlord so elects, with a contractor designated by Landlord.  Upon the request of Landlord, Tenant shall furnish  Landlord a copy of the HVAC maintenance contract, certified by Tenant to be in full force and effect. If after Landlord's request, Tenant fails to furnish Landlord a certified copy of the requested HVAC maintenance, Landlord shall have the right but not the obligation to enter into an HVAC maintenance contract for Tenant and Tenant agrees to pay the actual cost of said contract, as Additional Rent due hereunder.

Upon request of Landlord, Tenant shall furnish Landlord copies of work orders to insure compliance and condition of the system.  If Tenant refuses or neglects to repair properly as required hereunder and to the reasonable satisfaction of Landlord as soon as reasonably possible after written demand, Landlord may, but shall not be required to do so, make such repairs without liability to Tenant for any loss or damage that may accrue to Tenant's merchandise, fixtures, or other property or to Tenant's business by reason thereof, and upon completion thereof, Tenant shall pay Landlord's costs for making such repairs plus twenty percent (20%) for overhead, upon presentation of a bill therefore, as Additional Rent.  Such bill shall include interest at a rate equal to the lesser of (i) the highest permissible rate under applicable law, or, (ii) fifteen percent (15%) per annum on the cost from the date of completion of repairs by Landlord.

### ARTICLE 29
### LANDLORD'S REPAIRS

Within a reasonable period after receipt of written notice from Tenant and except for those items specifically mentioned in Article 28 Landlord shall, pursuant to Article 14, repair and maintain the exterior of Tenant's store building, including the roof, gutter, downspouts, masonry walls, foundation and structural members, in good condition and repair.  Landlord shall repair any portion of the Common Areas at any time when Landlord determines it necessary; provided, however, that Landlord shall not be obligated to make or pay for any repairs to Tenant's store building or Common Areas rendered necessary by the fault, act or negligence of Tenant or any of its servants, agents, employees, contractors, assignees, sublessees, licensees or concessionaires except in the case of damage by fire or the elements, or other casualty to the extent covered by Landlord's property insurance.

If Landlord makes any repairs necessitated  by reason of Tenant's negligent acts or omissions to act or by Tenant's employee's, contractor's. agent's, assignee's, sublessee's, concessionaire's, or licensee's negligent acts or omissions to act, then Tenant shall pay Landlord's costs for making such repairs plus twenty percent (20%) for overhead, upon presentation of a bill therefore, as Additional Rent.  Such bill shall include interest at a rate equal to the lesser of (i) the highest permissible rate under applicable law, or (ii) fifteen percent (15%) per annum on the cost from the date of completion of repairs by Landlord.

### ARTICLE 30
### UTILITIES

Tenant agrees to pay all charges for telephone, electricity, water, sewer and other utilities or services (including impact fees or tap fees associated with Tenant's occupancy) used by Tenant in or on the Leased Premises, and Landlord agrees at all times to provide Tenant with access to such utilities; provided, however, in no event shall Landlord be liable for any interruption or failure in the supply of utilities to the Leased Premises. Tenant shall pay for all such utilities from the date Landlord delivers the Leased Premises to Tenant.

If a utility service is provided through a meter utilized by multiple tenants then Landlord, at its election, may install re-registering meters and collect any and all charges aforesaid from Tenant, making returns to the proper utility company or governmental unit, provided that Tenant shall not be charged more than the rates it would be charged for the same services if furnished direct to the Leased Premises by such companies or governmental units.  Said payment by Tenant shall be treated as Additional Rent hereunder.

Any utility or related service, including a privately owned sewerage disposal system, which Landlord elects to provide or cause to be provided to the Leased Premises may be furnished by any agent employed by Landlord or by an independent contractor selected by Landlord, and Tenant shall accept the same therefrom to the exclusion of all other suppliers so long as the rates charged by Landlord or by the supplier of such utility or related service are competitive.  Interruption or impairment of any such utility or related services caused by or necessitated by repairs or improvements, or by hazards  beyond the reasonable control of Landlord, shall not give rise to a right or cause of action by Tenant against Landlord.

### ARTICLE 31
### RIGHT OF ACCESS

During any reasonable time before and after the Commencement Date of this Lease, Landlord or its authorized representative may enter upon the Leased Premises, or any portion thereof, and any appurtenances thereto (with persons, and materials, if required) for any of the following purposes:

(A)    inspecting the Leased Premises;

(B)    making any required repairs, replacements, or alterations which Landlord may be required to perform under this Lease, or which Landlord may deem desirable for the Leased Premises; and

(C)    showing the Leased Premises to prospective purchasers, lenders or tenants.

Notwithstanding any language contained herein to the contrary, Landlord may enter the Leased Premises when, in Landlord's sole discretion, an emergency situation exists and entrance is required to control or coordinate the control of the emergency.

Landlord shall have the right to place upon the storefront of the Leased Premises a "for lease" or "for rent" sign at any time within the period of one hundred twenty (120) days prior to the expiration of the Lease Term, unless Tenant executed a new lease for the Premises or exercises any renewal or extension  option granted herein.

### ARTICLE 32
### SIGNS

Within ten (10) days after Tenant takes possession of the Leased Premises or opens for business whichever shall first occur, Tenant shall have installed its exterior signage pursuant to this Article 32.  If Tenant does not comply with the foregoing requirement, Tenant shall pay Landlord fifty dollars ($50) per day as Additional Rent as a penalty until such sign is installed.  "Signs" shall include all signs, designs, monuments, logos, banners, projected images, pennants, decals, advertisements, pictures, notices, lettering, numerals, graphics or decoration. Tenant shall not maintain or display any signs that are visible from the exterior of the

Leased Premises, including without limitation, any signs on the exterior of the Leased Premises (including without limitation, any marquee, awning, or canopy), the interior of the Leased Premises, or either side of any window without complying with this Article and the Sign Criteria as defined on **Exhibit "D"** attached hereto and without Landlord's prior written consent. Notwithstanding anything in this Article 32 or **Exhibit "D"** to the contrary, and subject to the requirements that Tenant must first obtain Landlord's written approval as to design, size and location, and that Tenant and the signage must comply in all respects with all applicable laws and ordinances, Tenant may temporarily use a "Grand Opening" and a "Coming Soon" banner for a period not to exceed six (6) weeks per banner in connection with opening for business in the Leased Premises. Tenant shall also be permitted, subject to the requirements that Tenant must first obtain Landlord's written approval as to design, size and location, and that Tenant and the signage must comply in all respects with all applicable laws and ordinances, Tenant may use similar special promotional banners on a temporary basis, no more than twice per calendar year, each for a period not to exceed four (4) weeks.

In addition, Tenant shall be permitted, subject to Landlord's prior written approval as to design and color, and subject to any applicable laws and ordinances, to install one (1) panel on the existing Shopping Center monument sign along Biscayne Boulevard as shown on **Exhibit "D-1"** attached hereto, at Tenant's sole cost and expense. Tenant's panels on the pylon signs shall be in the position as shown on **Exhibit "D-1"** attached hereto.

Said sign or signs shall be approved by Landlord in writing and installed by a professional sign company, and shall conform to all laws and ordinances; provided, however, that the care and maintenance of such signs shall be the responsibility of Tenant. Upon demand of Landlord, Tenant shall, at its sole cost and expense, immediately remove any signs that Tenant has placed or permitted to be placed that do not conform to this Article and Tenant agrees to repair and restore any damage caused by their installation or removal.

Upon termination or expiration of this Lease, Tenant shall be required to remove its exterior façade signage and repair any damage caused by the removal thereof. Such repair shall include, but not be limited to, the patching of holes or penetrations, and the painting of any patched areas, with paint which matches the color of the Shopping Center façade at the time such repairs are made.

Landlord shall have the right to temporarily remove any signs in connection with any repairs and/or renovations in or upon the Leased Premises or the Shopping Center wherein such signs are situated.

## ARTICLE 33
## FORCE MAJEURE

If either Landlord or Tenant shall fail to timely perform any of its obligations under this Lease (excluding Tenant's financial obligations, i.e. payment of Minimum Guaranteed Rent or Additional Rent) as a result of Force Majeure (as hereinafter defined), such party shall not be liable for loss or damage for such failure and the other party shall not be released from any of its obligations under this Lease. If either Landlord or Tenant is delayed or prevented from performing any of its obligations as a result of Force Majeure, the period of such delay or prevention shall be added to the time herein provided for the performance of any such obligation.

Force Majeure shall mean any period of delay which arises from or through Acts of God; strikes, lockouts, or labor difficulty; explosion, sabotage, accident, riot, or civil commotion; act of war, fire or other casualty; and delays caused by the other party.

## ARTICLE 34
## QUIET ENJOYMENT

Tenant, upon paying all sums due from Tenant to Landlord and performing and observing all of the terms, covenants and conditions of this Lease on Tenant's part to be performed and observed, shall peaceably and quietly have, hold and enjoy the Leased Premises during the Lease Term without interference from Landlord subject nevertheless to the terms of this Lease and to any mortgages, ground or underlying leases, agreements and encumbrances to which this Lease is or may be subordinated.

## ARTICLE 35
## BANKRUPTCY

In the event a petition in a bankruptcy or insolvency or for reorganization or for the appointment of a receiver or trustee of all or a portion of the property of Tenant shall be filed against Tenant in any court, pursuant to any statute either of the United States or of any state (hereinafter referred to as "Bankruptcy Law"),

and if, within thirty (30) days thereafter, Tenant fails to secure a discharge thereof, or in the event Tenant shall voluntarily file any such petition or make an assignment for the benefit of creditors or petition for or enter into an arrangement, or if this Lease is taken under writ of execution (herein called "Act of Bankruptcy"), then Tenant shall be deemed in breach and default of this Lease and Landlord, in its discretion and at its election may, to the extent permitted by law, elect to cancel and terminate this Lease.  Upon the cancellation and termination of this Lease pursuant to the provisions of this Article 35, Landlord, in addition to all the remedies provided by law, shall be entitled to all its remedies set forth in this Lease upon Tenant's default.

In the event this Lease is assumed or assigned by a trustee pursuant to the provisions of the prevailing Bankruptcy Law, then the trustee shall cure any default under this Lease and shall provide such adequate assurance of future performance of this Lease as is required by the Bankruptcy Law including the following:

(A)     the source of Minimum Guaranteed Rent and other considerations due under this Lease;

(B)     the assumption or assignment of this Lease will not breach any provision such as a radius, location, use or exclusivity provisions in any other lease, finance agreement or master agreement relating to the Shopping Center; and

(C)     the assumption or assignment of this Lease will not disrupt any tenant mix or balance.

In the event the trustee does not cure such defaults and provide such adequate assurances under the Bankruptcy Law, then this Lease shall be deemed rejected and Landlord shall have the right to immediate possession of the Leased Premises, and shall be entitled to all remedies provided by the Bankruptcy Law for damages for breach and/or termination of this Lease.

If this Lease shall be guaranteed on behalf of Tenant, all of the provisions of this Article with respect to the bankruptcy of Tenant, etc., shall be deemed to read "Tenant or the Guarantor hereof."

## ARTICLE 36
## CONDEMNATION

If more than twenty-five percent (25%) of the floor area of the  Leased Premises shall be taken in any proceeding by public authorities by condemnation or otherwise, or be acquired for public or quasi-public purposes, each of Tenant and Landlord shall have the option to terminate this Lease, in which case any prepaid Rent shall be refunded to Tenant.  In the event that less than twenty-five percent (25%) of the Leased Premises shall be taken in any proceeding by public authorities by condemnation or otherwise, or be acquired for public or quasi-public purposes, and the remaining part of the Leased Premises shall be reasonably usable by Tenant, or in the event more than twenty-five percent (25%) of the floor area of the Leased Premises is so taken and this Lease is not terminated in accordance with this Article 36, then the Minimum Guaranteed Rent shall be reduced in the same proportion that the amount of floor space in the Leased Premises is reduced by such condemnation or other proceeding.  In the event that twenty-five percent (25%) or more of the parking area of the Shopping Center shall be taken in any proceeding by public authorities by condemnation or otherwise, or be acquired for public or quasi-public purposes, Tenant shall have the option to terminate this Lease; provided, however, that Landlord shall have a period of ninety (90) days to cure the parking deficiency, or to diligently proceed to cure the parking deficiency, in which event Tenant shall not have the right to cancel this Lease; and further provided, that Tenant shall not have the right to cancel this Lease so long as Landlord maintains a parking ratio of at least three (3) parking spaces per one thousand (1,000) square feet of leasable building area in the Shopping Center.  All compensation awarded for any taking (or the proceeds of private sale under threat thereof), whether for the whole or a part of the Leased Premises, shall be the property of Landlord, whether such award is compensation for damages to Landlord's or Tenant's interest in the Leased Premises, and Tenant hereby assigns all of its interest in any such award to Landlord; provided, however, Landlord shall have no interest in any award made to Tenant for loss of business, for moving expenses, or for the taking of Tenant's fixtures and personal property within the Leased Premises, if a separate award for such items is made to Tenant.  In the event applicable law permits only one claim with respect to a taking, then Landlord and Tenant agree to file a joint claim to prosecute their respective claims.

## ARTICLE 37
## ASSIGNMENT AND SUBLETTING

All assignments of this Lease or subleases of the Leased Premises by Tenant shall be subject to and in accordance with all of the provisions of this Lease including Article 37.  So long as Tenant is not in default under any of the provisions of this Lease and fulfills all of the terms and conditions of this Article 37 then:

(A)    Tenant may assign this Lease or sublease the entire Leased Premises without the consent of Landlord to a wholly owned subsidiary of Tenant or immediate controlling corporation (for such period of time as such corporation remains such a subsidiary or such a controlling corporation, respectively, it being agreed that the subsequent sale or transfer of stock resulting in a change in voting control, or any other transaction(s) having the overall effect that such corporation ceases to be such a subsidiary or such a controlling corporation, respectively, of Tenant, shall be treated as if such sale or transfer or transaction(s) were, for all purposes, an assignment of this Lease governed by the provisions of this Article 37, provided (and it shall be a condition of the validity of any such assignment) that such wholly owned subsidiary or such immediate controlling corporation first agree directly with Landlord to be bound by all of the obligations of Tenant hereunder, including, without limitation, the obligation to pay the rent and other amounts provided for under this Lease, the covenant to use the Leased Premises only for the purposes specifically permitted under this Lease and the covenant against further assignment, but such assignment shall not relieve Tenant herein named of any of its obligations hereunder, and Tenant shall remain fully liable therefor.

(B)    Tenant may assign this Lease or sublease all or any part of the Leased Premises to a party other than a wholly owned corporation or controlled subsidiary only after first obtaining the prior written consent of Landlord, which consent shall not be unreasonably withheld.    Without limiting the generality of this Article 37(B), it will be reasonable for Landlord to refuse consent to any assignment or subletting ("Transfer") if, at the time of either Tenant's notice of the proposed Transfer or the proposed commencement date thereof (i) there shall exist an event of default by Tenant or matter which will become an event of default of Tenant with passage of time or the giving of notice, or both, unless cured; (ii) the proposed transferee pursuant to such Transfer ("Transferee") is an entity (aa) with which Landlord is already in negotiation as evidenced by the issuance of a written proposal; (bb) which is already an occupant of the Shopping Center; (cc) which is incompatible with the character of occupancy of the Shopping Center or which would violate any exclusive or use restriction in title or the lease of another tenant at the Shopping Center; or (dd) which would subject the Leased Premises to a use which would (1) involve increased insurance, personnel or wear upon the Shopping Center, (2) violate any exclusive rights or restrictions contained in the lease of another tenant of the Shopping Center, or conflict with the primary use of another tenant, (3) require any structural additions to (including improvements thereon) or modifications of the Leased Premises, or all or any portion of the Shopping Center, or any additional action by Landlord, in order to comply with building code or other governmental requirements, or (4) increase the governmental parking requirements for the Leased Premises or the Shopping Center; (iii) the tangible net worth (exclusive of good will) of the Transferee, immediately prior to and following such Transfer, is less than Ten Million Dollars ($10,000,000.00); (iv) the Transferee has less than five (5) years' experience with respect to owning or operating a retail store; (v) the nature of the proposed Transferee's proposed or likely use of the Leased Premises would involve any increase risk of the use, release or mishandling of any Hazardous Substances and/or Hazardous Materials (as defined in Article 58); (vi) the business reputation or character of the proposed Transferee or the business reputation or character of any of its affiliates is not reasonably acceptable to Landlord; (vii) Landlord has not received assurances acceptable to Landlord in its sole discretion that all past due amounts owing from Tenant to Landlord (if any) will be paid and all other defaults on the part of Tenant (if any) will be cured prior to the effectiveness of the proposed Transfer; (viii) Landlord is not satisfied that the proposed Transferee's assets, businesses or inventory would not be subject to seizure or forfeiture under any laws related to criminal or illegal activities; or (ix) the Transferee will not qualify as a replacement tenant under any co-tenancy or other similar provision in any other lease or agreement in or affecting the Landlord or the Shopping Center.  In no event may Tenant mortgage, pledge or otherwise encumber its leasehold interest as collateral for a debt.  Within thirty (30) days after written request therefor by Tenant, Landlord shall provide Tenant with a list of all the existing exclusive uses granted in leases or occupancy agreements to other tenants or occupants of the Shopping Center or prohibited uses (from leases or occupancy agreements) of the Shopping Center.

Except as set forth in subparagraph (A) above, any assignment or sublease by Tenant without Landlord's prior written consent shall be void and, at Landlord's election, shall constitute a default of Tenant hereunder.  Consent by Landlord to one or more assignments or sublettings shall not operate as a waiver of Landlord's rights with respect to any subsequent assignment or subletting.  If Tenant is a partnership, a withdrawal or change (voluntary, involuntary, or by operation of law) of any partner owning 20% or more of the partnership,

or the dissolution or liquidation of the partnership shall be deemed an assignment of this Lease.  If Tenant consists of more than one person, a purported assignment (voluntary, involuntary, or by operation of law) from any of such persons to any other person or entity shall be deemed an assignment of this Lease.  If Tenant is a corporation, any dissolution, merger, consolidation, or other reorganization of Tenant, or the sale or other transfer of fifty-one percent (51%) of the voting stock of Tenant, or the sale of fifty-one percent (51%) of the value of the assets of Tenant, shall be deemed an assignment of this Lease.  The foregoing provisions shall not apply to corporations, the stock of which is regularly traded through a recognized exchange.  The term "sublet" shall be deemed to include the granting of licenses, concessions, and any other rights of occupancy of any portion of the Leased Premises.

Notwithstanding the foregoing provisions of subparagraphs (A) and (B) above, any assignment or sublease by Tenant shall be only for the use(s) specified in Article 1(R) and for no other use(s), and in no event shall any assignment or sublease of the Leased Premises release or relieve Tenant from any obligation of this Lease.

In the event that Tenant receives a bona fide written offer from a third party for the sublease or assignment of the Leased Premises except for an assignment or sublease in accordance with subparagraph (A) above, Tenant shall forthwith notify Landlord in writing, attaching a copy of said offer, of Tenant's desire to sublet or assign this Lease upon the terms of said offer, whereupon Landlord shall have thirty (30) days to accept or reject said assignment or sublease, or at Landlord's sole option (and in lieu of consenting to any assignment), cancel and terminate this Lease, in which case Landlord may elect to (but shall not be obligated to) enter into a direct lease with the proposed assignee or subtenant.  Tenant shall furnish Landlord with such information regarding the prospective assignee or sublessee as Landlord may require, including without limitation information regarding financial ability and business experience relating to the uses hereunder.  The failure of Landlord to either accept or reject said assignment or sublease within the said thirty (30) day period shall be deemed a rejection of said assignment or sublease.

In the event Tenant shall sublease the entire Leased Premises, or any portion thereof, in accordance herewith for rentals in excess of those rentals payable hereunder, Tenant shall pay to Landlord, as Additional Rent hereunder, all such excess rental.

As a condition to Landlord's processing of any request by Tenant for approval to assign or sublease the Leased Premises, any such request shall be accompanied by a check made payable to Landlord in the amount of Two Thousand ($2,000.00) Dollars, which shall be non-refundable when paid regardless of whether Landlord shall grant consent or Tenant's proposed assignment or sublet transaction shall go into effect.

The term "Landlord" as used in this Lease means only the owner or entity from time to time owning the building containing the Leased Premises, so that in the event of any transfer thereof, the owner or entity who is a grantor in any such transfer shall be and hereby is, without further agreement, entirely freed and relieved of all the obligations of Landlord hereunder.  Any such transfer of the Leased Premises, unless pursuant to a foreclosure sale or deed in lieu of such foreclosure, shall be subject to this Lease and it shall be deemed and construed without further agreement that the purchaser at any such sale has assumed and agreed to carry out any and all obligations of Landlord under this Lease so long as such purchaser shall be the owner of the building containing the Leased Premises.

Landlord shall have the right to sell, convey, transfer or assign all or part of its interest in the real property and the buildings of which the Leased Premises are a part or its interest in this Lease. All covenants and obligations of Landlord under this Lease shall cease upon the execution of such conveyance, transfer or assignment; provided, however that such covenants and obligations shall be binding upon the subsequent owner or owners thereof or holders of this Lease.

## ARTICLE 38
## SUBORDINATION AND ATTORNMENT

Tenant agrees that this Lease shall at all times automatically be subject and subordinate to the lien of any mortgages (which term shall include all security instruments) that are now existing or that may be placed on the Shopping Center or any portion thereof containing the Leased Premises by Landlord, and to any and all advances to be made thereunder, and to the interest thereon and all renewals, modifications, replacements and extensions thereof, without the need for any further instrument or for the mortgagee or trustee named in said mortgages or deeds of trust to make any election; except that any mortgagee or trustee may elect to give the rights and interest of Tenant under this Lease priority over the lien of its mortgage or deed of trust by notice delivered to Tenant.  In the event of such election, and upon notification by such mortgagee or trustee to Tenant

to that effect, the rights and interest of Tenant under this Lease shall be automatically deemed to have priority over the lien of said mortgage or deed of trust, without the need for any further instrument, whether this Lease is dated prior to or subsequent to the date of said mortgage or deed of trust. This clause shall be self-operative and no further instrument of subordination shall be required to effectuate such subordination. Tenant agrees, upon demand, without cost, to execute any instrument as may be required to confirm such subordination within seven (7) business days after Landlord's request.

If Tenant fails to execute, acknowledge and deliver to Landlord or a mortgagee or prospective mortgagee of Landlord a statement in accordance with the foregoing provision of this Article 38 within ten (10) business days after the mailing of such request, Landlord, in addition to any other remedies available to it in consequence thereof, may execute, acknowledge and deliver the same as the attorney-in-fact of Tenant and in Tenant's name, place, and stead, and Tenant hereby irrevocably makes, constitutes and appoints Landlord, its successors and assigns, as such attorney-in-fact for that purpose.

At the option of the holder of any mortgage affecting the Leased Premises, Tenant agrees that no foreclosure of a mortgage affecting the Leased Premises, nor the institution of any suit, action, summary or other proceeding against Landlord herein, or any successor landlord, or any foreclosure proceeding brought by the holder of any such mortgage to recover possession of such property, shall by operation of law or otherwise result in cancellation or termination of this Lease or the obligations of Tenant hereunder, and upon the request of the holder of any such mortgage, Tenant covenants and agrees to execute an instrument in writing satisfactory to such party or parties or to the purchaser of the mortgaged premises in foreclosure whereby Tenant attorns to such successor in interest.

With reference to any assignment by Landlord of Landlord's interest in this Lease, or the rents payable hereunder, conditional in nature or otherwise, which assignment is made to the holder of any mortgage on the Leased Premises, Tenant agrees:

(A)    that the execution thereof by Landlord, and the acceptance thereof by such holder, shall never be deemed to be an assumption by such holder of any of the obligations of Landlord hereunder, unless such holder shall, by written notice sent to Tenant, specifically otherwise elect; and

(B)    that, except as aforesaid, such holder shall be treated as having assumed Landlord's obligations hereunder only upon foreclosure of such holder's mortgage and the taking of possession of the Leased Premises by such holder.

### ARTICLE 39
### TENANT'S ESTOPPEL CERTIFICATE

Within seven (7) business days after each request by Landlord is received by Tenant, Tenant shall deliver an estoppel certificate to Landlord ("Estoppel Certificate"). The Estoppel Certificate shall be in writing, and shall be executed on behalf of Tenant by persons having appropriate authority. Each Estoppel Certificate shall be made in favor of Landlord, any mortgagee, any assignee, any purchaser or any other person specified by Landlord.

Each Estoppel Certificate shall contain information required by Landlord, and satisfactory to any mortgagee, assignee, purchaser or other person specified by Landlord including, but not limited to the following:

(A)    ratifying this Lease;

(B)    specifying the Commencement Date and termination date of this Lease Term;

(C)    certifying that this Lease is in full force and effect and has not been assigned, modified, supplemented or amended (except by such writings as shall be so stated);

(D)    that all conditions and obligations under this Lease to be performed by Landlord have been satisfied or stating those not performed;

(E)    that there are no defenses or offsets against the enforcement of this Lease by Tenant or specifying any such defenses;

(F)    the amount of current Rent and the date to which all Rent has been paid;

(G)     any contractual Rent modifications beyond the date of estoppel;

(H)     the approximate number of square feet of floor space in the Leased Premises;

(I)     that no Rent has been paid in advance or specifying any such advance Rent; and

(J)     the amount of the security deposit held by Landlord.

If Tenant fails to execute, acknowledge and deliver to Landlord or any mortgagee, assignee, purchaser or other person specified by Landlord a statement in accordance with the foregoing provision of this Article 39 within ten (10) business days after the mailing of such request, such shall constitute an acknowledgment by Tenant that this Lease is unmodified and in full force and effect and that all conditions and obligations under this Lease to be performed by Landlord have been satisfied, and that there are no defenses or offsets against the enforcement of this Lease by Tenant.

## ARTICLE 40
### EXCULPATION

Tenant specifically agrees to look solely to Landlord's interest in the Shopping Center for recovery of any judgment from Landlord, it being specifically agreed that neither Landlord nor anyone claiming under Landlord shall ever be personally liable for any such judgment.  In no event shall Landlord ever be liable to Tenant for any indirect or consequential damages.

## ARTICLE 41
### NOTICE

Whenever by the terms of this Lease notice, demand, or other communication shall or may be given either to Landlord or Tenant, the same shall be in writing and in compliance with the terms of this Article 41.

All notices required to be given to Landlord shall be delivered by hand, sent by United States registered or certified mail, return receipt requested, postage prepaid  or express delivery by a nationally recognized courier to the address shown in Paragraph 1(B).  All Rent payments shall be made to Landlord at the address shown in Paragraph 1(C).

All notices required to be given to Tenant shall be delivered by hand, sent by United States registered or certified mail, return receipt requested, postage paid or express delivery by a nationally recognized courier to Tenant at the address shown in Paragraph 1(E).

Any such notice shall be considered given on the date of such hand delivery, deposit with such overnight courier for next business day delivery, or deposit in the United States mail, but the time period (if any is provided herein) in which to respond to such notice shall commence on the date of hand or courier delivery or on the date received following deposit in the United States mail as provided above.  Rejection or other refusal to accept or inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice.

All usual or ordinary correspondence shall be sent by regular mail.  Each party shall promptly notify the other in writing of any change of address.  Any such notice, demand or communication from an attorney acting or purporting to act on behalf of a party shall be deemed to be notice from such party provided that such attorney is authorized to act on behalf of such party.

## ARTICLE 42
### HOLDING OVER

If Tenant remains in possession of the Leased Premises after the termination or expiration of this Lease and without the execution of a new lease, Tenant shall be deemed to be occupying the Leased Premises as a tenant at sufferance at a rent equal to 200% of the Rent that Tenant paid for the Lease Year immediately preceding the termination or expiration of this Lease and all other terms and conditions of this Lease shall apply.

## ARTICLE 43
## PARTIAL INVALIDITY

If any term or provision of this Lease or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and be enforceable to the fullest extent permitted by law.

## ARTICLE 44
## SIGNATURES REQUIRED

The submission of this document does not constitute a binding Lease  until such time as it has been executed and delivered by Tenant and Landlord.

## ARTICLE 45
## NO JOINT VENTURE

The relationship of the parties is that of Landlord and Tenant only, and nothing in this Lease shall be construed as creating a partnership, joint venture, principal, agent or any other relationship.  Except as expressly otherwise provided herein, neither party shall have any right or power to create any expense or liability chargeable to the other party.

## ARTICLE 46
## TIME OF ESSENCE

Time is of the essence in this Lease, and all provisions herein relating thereto shall be strictly construed.

## ARTICLE 47
## ACCORD AND SATISFACTION

No payment by Tenant or receipt by Landlord of a lesser amount than the Minimum Guaranteed Rent or other amounts herein stipulated shall be deemed to be other than on account of the stipulated Rent and amounts due, nor shall any endorsement or statement on any check or any letter accompanying any check or payment thereof be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such amounts or pursue any other remedy provided in this Lease.

## ARTICLE 48
## RECORDATION

Tenant agrees not to record this Lease and further agrees to execute, acknowledge and deliver at any time after the Commencement Date of this Lease, at the request of Landlord, a short form lease suitable for recording.

## ARTICLE 49
## CAPTIONS

The captions contained herein are for convenience and reference only and shall not be deemed as part of this Lease or construed as in any manner limiting or amplifying the terms and provisions of this Lease to which they relate.

## ARTICLE 50
## RESPONSIBILITY OF TENANT

Any restriction on, or requirement imposed upon Tenant under this Lease shall be deemed to extend to the Guarantor and Tenant's subtenants, concessionaires and licensees; and it shall be Tenant's obligation to cause the foregoing persons to comply with the restrictions and requirements of this Lease.

All obligations of Tenant under this Lease not fully performed as of the expiration or earlier termination of the Term shall survive the expiration or earlier termination of the Term.

## ARTICLE 51
## SURRENDER OF PREMISES

On the expiration or earlier termination of this Lease, Tenant shall surrender promptly the Leased Premises to Landlord in the same condition as when received, ordinary wear and tear excepted.  All alterations, installations, additions and improvements which have been made in or attached to the Leased Premises shall be surrendered along with the Leased Premises.  Tenant shall remove its trade fixtures (including signs), and Tenant shall repair any damage to the Leased Premises and/or sign band caused thereby.

## ARTICLE 52
## GOVERNING LAW AND INTERPRETATION

This Lease shall be governed by the laws of the State in which the Leased Premises are located.

Both parties have read this Lease and had the opportunity to employ legal counsel and negotiate changes to the Lease.  The Lease is the joint product of the parties and, in the event of any ambiguity herein, no inference shall be drawn against a party by reason of document preparation.

## ARTICLE 53
## BROKERS

Landlord and Tenant, respectively, represent and warrant to the other that it has not dealt with any real estate brokers or other persons who may claim a fee or commission in connection with this Lease other than the Broker, if any, listed in Article 1(Y), and each party agrees to indemnify and hold the other harmless against any such claim made by any other broker claiming by, through or under such party.  Tenant's obligations hereunder shall survive the expiration or earlier termination of this Lease.

## ARTICLE 54
## ATTORNEYS' FEES; LANDLORD'S FEES AND EXPENSES

In the event that any legal matter, dispute, action or proceeding exists or is commenced by or between Landlord and Tenant under this Lease, the prevailing party shall be reimbursed reasonable attorneys' fees and court costs in such matter.  If either party hereto without fault is made a party to any litigation instituted by or against any other party to this Lease, such other party shall indemnify and hold harmless Landlord or Tenant, as the case may be, against all costs and expenses, including reasonable attorneys' fees incurred in connection therewith.

Unless prohibited by applicable law or otherwise expressly set forth herein, Tenant agrees to pay to Landlord the amount of all legal fees and expenses incurred by Landlord arising out of or resulting from any act or omission by Tenant with respect to this Lease or the Leased Premises, including without limitation, any breach by Tenant of its obligations hereunder.

Further, if Tenant shall request Landlord's consent or joinder in any instrument pertaining to this Lease, Tenant agrees promptly to reimburse Landlord for the actual legal fees incurred by Landlord in processing such request, whether or not Landlord complies therewith and in addition to any specific fee provided for in this Lease; and if Tenant shall fail promptly so to reimburse Landlord, the same shall be deemed to be a default in Tenant's monetary obligations under this Lease.

Whenever Tenant shall request approval by Landlord or Landlord's architect of plans, drawings, specifications, or otherwise with respect to initial alteration of the Leased Premises, subsequent remodeling thereof, installation of signs including subsequent changes thereof, or the like, Tenant specifically agrees promptly to pay to Landlord's architect (or reimburse Landlord for the payment Landlord makes to said architect) for all charges involved in the review and re-review, if necessary and approval or disapproval thereof, whether or not approval shall ultimately be given.

## ARTICLE 55
## ABANDONMENT OF PERSONAL PROPERTY

Should Tenant fail to remove its personal property upon abandonment, expiration, termination or recovery of possession by Landlord, then upon such abandonment, expiration, termination or recovery of possession and after ten (10) days' written notice to Tenant, which notice shall also be conspicuously posted on the Leased Premises, all personal property of any nature then remaining on the Leased Premises shall be

deemed abandoned and title thereto shall vest exclusively to Landlord, unless Landlord shall give notice to Tenant to remove all or any part of such personal property in which event Tenant shall promptly, at its own expense, remove same or Landlord may do so at Tenant's expense and said expense shall be treated as Additional Rent hereunder.   Tenant hereby waives and agrees to hold Landlord harmless from any claim for loss of damage arising from Landlord's dealing with Tenant's personal property pursuant to the terms of this Article 55.

## ARTICLE 56
## ADA PROVISION

Tenant shall be liable for any cost, claim or alteration arising from the Americans with Disabilities Act which is:

(A)     related to the Leased Premises, including, but not limited to, all doors (both interior and exterior), door hardware, electrical, plumbing, and floor covering, (unless resulting from improvements or alterations hereafter made by Landlord to the Shopping Center or the Leased Premises);

(B)     resulting from any improvement or alteration of the Leased Premises made by Tenant; or

(C)     resulting from Tenant's use of the Leased Premises.

Landlord shall be liable for any cost, claim or alteration arising from the Americans with Disabilities Act which results from improvements or alterations hereafter made by Landlord to the Common Areas or the Leased Premises.

## ARTICLE 57
## CLARIFICATION OF TERMS

The terms "Landlord" and "Tenant" shall include, whenever the context permits or requires, as singular or plural, the parties hereto, and the heirs, legal representatives, successors and assigns of the respective parties.

## ARTICLE 58
## ENVIRONMENTAL MATTERS

As used herein, "Hazardous Substances and/or Hazardous Materials" shall mean any substance, chemical, compound, product, solid, gas, liquid, waste, byproduct, pollutant, contaminant, or material which is hazardous or toxic, and includes, without limitation, (a) asbestos, polychlorinated biphenyls, and petroleum (including crude oil or any fraction thereof) and (b) any such material classified or regulated as "hazardous" or "toxic" pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 USC 9601 et seq., Solid Waste Disposal Act, as amended by the Resources Conservation and Recovery Act of 1976 and Hazardous and Solid Waste Amendments of 1984, 42 USC 6901 et seq., Federal Water Pollution Control, as amended by the Clean Water Act of 1977, 33 USC 1251 et seq., Clean Air Act of 1966, as amended, 42 USC 7401 et seq., Toxic Substances Control Act of 1976, 15 USC 2601 et seq., or Hazardous Materials Transportation Act, 49 USC App. 1801 et seq.

As used herein, "Environmental Law" shall mean any current or future Legal Requirement pertaining to (a) the protection of health, safety, and the indoor or outdoor environment, (b) the conservation, management, or use of natural resources and wildlife, (c) the protection or use of surface water and groundwater, (d) the management, manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal or Release (as hereinafter defined) of Hazardous Substances and/or Hazardous Materials, (e) pollution (including any Release to air, land, surface water, and groundwater), and includes, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 USC 9601 et seq., Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 and Hazardous and Solid Waste Amendments of 1984, 42 USC 6901 et seq., Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977, 33 USC 1251 et seq., Clean Air Act of 1966, as amended, 42 USC 7401 et seq., Toxic Substances Control Act of 1976, 15 USC 2601 et seq., Hazardous Materials Transportation Act, 49 USC App. 1801 et seq., Occupational Safety and Health Act of 1970, as amended, 29 USC 651 et seq., Oil Pollution Act of 1990, 33 USC 2701 et seq. Emergency Planning and Community Right-to-Know Act of 1986, 42 USC 11001 et seq., National Environmental Policy Act of 1969, 42 USC 4321 et seq., Safe Drinking Water Act of 1974, as amended, 42 USC 300(f) et seq., any

similar implementing or successor law, any similar State law or regulation, and any amendment, rule, regulation, order, or directive issued thereunder.

As used herein, "Release" shall mean any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the indoor or outdoor environment, including, without limitation, the abandonment or discarding of barrels, drums, containers, tanks, and other receptacles containing or previously containing any Hazardous Substances and/or Hazardous Materials.

Tenant shall not cause or permit any Hazardous Substances and/or Hazardous Materials to be used, stored, generated or disposed of on or in the Leased Premises by Tenant, Tenant's agents, employees, contractors or invitees. If the Leased Premises become contaminated in any manner, Tenant shall indemnify and hold harmless Landlord from any and all claims, damages, fines, judgments, penalties, costs, liabilities or losses (including, without limitation, a decrease in value of the Leased Premises, damages due to loss or restriction of rentable or usable space, or any damages due that adversely impact the marketing of the space, and any and all sums paid for settlement of claims, attorneys' fees, reasonable consultant and expert fees) arising during the Lease Term or any renewal of this Lease, and arising as a result of such contamination by Tenant. This indemnification includes, without limitation, any and all costs incurred due to any investigation of the site or any cleanup, removal or restoration mandated by a federal, state or local agency or political subdivision. Without limitation of the foregoing, if Tenant causes or permits the presence of any Hazardous Substances and/or Hazardous Materials on the Leased Premises and such results in contamination, Tenant shall promptly, at its sole expense, take any and all necessary actions to return the Leased Premises to the condition existing prior to the presence of any such Hazardous Substances and/or Hazardous Materials on the Leased Premises. Tenant shall undertake no testing for Hazardous Substances and/or Hazardous Materials on the Leased Premises or take any remedial actions without in each instance obtaining Landlord's prior written consent, which consent shall not be unreasonably withheld or delayed. Landlord shall have access to the Leased Premises in order to investigate and test with respect to any suspected release of Hazardous Substances and/or Hazardous Materials in contravention of this subparagraph, and to access the Leased Premises as needed for any remedial action deemed necessary by Landlord.

Tenant shall not intentionally or unintentionally discharge, Release or emit, or permit to be discharged, Released or emitted, any material into the atmosphere, ground, sewer system or any body of water, if such material (as reasonably determined by Landlord or any governmental authority) does or may, pollute or contaminate the same, or may adversely affect (a) the health, welfare, or safety of persons, whether located on the Leased Premises or elsewhere, or (b) the condition, use or enjoyment of the Shopping Center or any other real or personal property.

Tenant shall further:

(A)   maintain the Leased Premises in compliance in all material respects with any applicable Environmental Law and be responsible for making any notification or report concerning the Leased Premises to a governmental authority required to be made by any applicable Environmental Law;

(B)   obtain and maintain in full force and effect all material governmental approvals required by any applicable Environmental Law for operations at the Leased Premises;

(C)   expeditiously cure, to the reasonable satisfaction of Landlord, any material violation of applicable Environmental Laws at the Leased Premises, at its own expense, to the extent such violation is attributable to events or conditions which arose on or after the delivery date of the Leased Premises by Landlord to Tenant;

(D)   conduct expeditiously to the reasonable satisfaction of Landlord and in accordance with any applicable Environmental Law any action necessary to remove, remediate, clean up, or abate any material Release, threatened Release, or disposal of a Hazardous Material at Tenant's expense to the extent such response action is attributable to events or conditions which arose on or after the delivery date of the Leased Premises by Landlord to Tenant;

(E)   allow Landlord or its representatives from time to time at Landlord's reasonable discretion and expense to inspect the Leased Premises and conduct an environmental assessment (including invasive soil or groundwater sampling), including, without limitation, to facilitate any other sale or lease of the Shopping Center;

(F)    promptly provide or otherwise make available to Landlord any reasonably requested environmental records concerning the Leased Premises which Tenant possesses or can reasonably obtain;

(G)    remove from the Leased Premises and/or Shopping Center, at its expense, by the termination date any Hazardous Materials or equipment to manufacture, generate, transport, treat, store, dispose, or handle any Hazardous Material used by Tenant or in the course of Tenant's business, including, without limitation, any underground storage tank;

Tenant shall indemnify, hold harmless, and hereby waives any claim for contribution against Landlord or Landlord's property manager for any damages to the extent they arise from:

(A)    Events or conditions which existed on or after the delivery date of the Leased Premises by Landlord to Tenant and relate to:

(i)    any Release, threatened Release, or disposal of any Hazardous Material at or about the Leased Premises;

(ii)    the operation or violation of any Environmental Law at or about the Leased Premises; or

(iii)    any environmental claim in connection with the Leased Premises; or,

(B)    The inaccuracy or breach of any representation or warranty by Tenant in this section of this Lease.

(C)    This indemnification and waiver shall be binding upon successors and assigns of Tenant and to the benefit of Landlord, their directors, officers, employees and agents, and their successors and assigns and shall survive the termination of this Lease.

Tenant's obligations hereunder shall survive the expiration or earlier termination of this Lease.

### ARTICLE 59
### PERSONAL INTEREST DISCLOSURE

Tenant acknowledges, by way of his/her signature below, that the agent with whom he/she is negotiating, because of possible personal interest in this property, will only represent Landlord.  Tenant may wish to seek third party representation to advocate his or her rights, at Tenant's sole cost and expense.

### ARTICLE 60
### RADON GAS

The Shopping Center has not been tested for radon gas.  Florida Statute 404.056(8) requires that the following statement be part of this Lease: "RADON GAS: Radon is a naturally occurring gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time.  Levels of radon that exceed federal and state guidelines have been found in buildings in Florida.  Additional information regarding radon and radon testing may be obtained from your county public health unit."

### ARTICLE 61
### LIQUOR LIABILITY INSURANCE

In the event that at any time during the term of this Lease or any extension or renewal thereof, beer, wines or other alcoholic liquors or beverages are sold or given away upon or from the Leased Premises (it being understood and agreed, however, that the foregoing provision shall not authorize the use of the Leased Premises for such purposes without the express consent of Landlord being set forth otherwise in this Lease), Tenant shall, at its sole expense, obtain, maintain and keep in force, adequate liquor liability insurance protecting both Tenant and Landlord in connection therewith within policy limits acceptable to Landlord, but in no event less than statutory limits, if applicable.  In the event Tenant shall fail to procure such insurance where applicable, Landlord may procure the same at Tenant's expense and such expense shall be treated as Additional Rent hereunder.  In the event such insurance is not carried, sales or disbursements of the foregoing products shall be suspended until such coverage is in force.  Landlord shall be named as additional insureds on such coverage,

and a certificate of such coverage from the insurer providing thirty (30) days notice to Landlord prior to cancellation or termination shall be furnished to Landlord.

### ARTICLE 62
### NO WAIVERS; AMENDMENTS

Failure of Landlord to insist upon strict compliance by Tenant of any condition or provision of this Lease shall not be deemed a waiver by Landlord of that condition.  No waiver shall be effective against Landlord unless in writing and signed by Landlord.  Similarly, this Lease cannot be amended except by a writing signed by Landlord and Tenant.

### ARTICLE 63
### ENTIRE AGREEMENT

This Lease contains all of the agreements between the parties hereto and may not be modified in any manner other than by agreement in writing signed by all the parties hereto or their successors in interest.  This Lease may not be changed or terminated orally.  There are no other agreements, representations or inducements, whether written or oral, between the parties concerning the subject matter of this Lease.

### ARTICLE 64
### TENANT COVENANTS

Notwithstanding anything to the contrary contained herein, this Lease is subject to and made on the understanding that Landlord has granted and/or may or will grant certain restrictions and exclusive use covenants to other tenants of the Shopping Center (the "Tenant Covenants").  Tenant acknowledges that Tenant's use and/or occupancy of the Leased Premises in violation of any current or future Tenant Covenants would subject Landlord to substantial damages and as such Tenant acknowledges and agrees that any such violation by Tenant of any such Tenant Covenants shall constitute a default hereunder entitling Landlord to cancel this Lease or enjoin Tenant from violating such Tenant Covenants, or exercise any of the remedies for a Tenant default provided for herein and any other remedies available under the law of the state where the Leased Premises is located.  Nothing contained in this Article shall be construed to permit Tenant to expand the Permitted Use set forth in this Lease.

### ARTICLE 65
### SUCCESSORS AND ASSIGNS

Except as otherwise herein expressly provided, this Lease and all the covenants, terms, provisions and conditions herein contained shall inure to the benefit of and be binding upon the heirs, representatives, successors and assigns of each party hereto, and all covenants herein contained shall run with the land and bind any and all successors in title to Landlord.  The reference contained herein to successors and assigns of Tenant is not intended to constitute a consent to assignment by Tenant, but has reference only to those instances in which Landlord may later give consent to a particular assignment as required by the provisions of this Lease.

### ARTICLE 66
### GUARANTOR

This Lease shall not be effective unless the person listed in Article 1(X) hereof shall execute a Guaranty of Lease in the form of the Guaranty of Lease attached as **Exhibit "E"** to this Lease and made a part hereof.

### ARTICLE 67
### AUTHORITY

In the event Tenant and/or the Guarantor of Tenant's obligations hereunder shall be a corporation or limited liability company, the persons executing this Lease on behalf of Tenant hereby individually covenant and warrant that: Tenant is a duly qualified corporation or limited liability company; all steps have been taken prior to the date hereof to qualify Tenant to do business in the State in which the Shopping Center is located; all franchise and corporate or limited liability company taxes have been paid to date; all future forms, reports, fees and other documents necessary to comply with applicable laws will be filed when due; and those persons executing this Lease on behalf of Tenant are duly qualified and authorized to bind, and in fact do bind, the corporation or limited liability company.

In the event Tenant hereunder shall be a partnership, either general or limited, the persons or entities executing this Lease on behalf of Tenant hereby individually covenant and warrant that: Tenant is a duly qualified partnership; all steps have been taken prior to the date hereof to qualify Tenant to do business in the State in which the Shopping Center is located, if required by law; all franchise and partnership taxes have been paid to date; all future forms, reports, fees and other documents necessary to comply with applicable law will be filed when due; and those entities executing this Lease on behalf of the partnership are duly qualified to bind, and in fact do bind, the partnership.

### ARTICLE 68
### CONFIDENTIALITY

Tenant and its agents, employees, officers, directors, accountants and attorneys agree to keep the financial terms of this Lease strictly confidential, and shall not disclose, directly or indirectly, such terms to any person or entity without first obtaining the prior written consent of Landlord; provided, however, that Landlord's consent shall not be required for any disclosure (i) to Tenant's officers, directors, employees, lenders, accountants, attorneys or current or potential investors in, or purchasers of Tenant's business; or (ii) when compelled by applicable laws, regulations or court orders.

### ARTICLE 69
### TERMINATION

Landlord shall have the right to terminate this Lease in the event Landlord redevelops or demolishes the Shopping Center or any part thereof provided Landlord gives Tenant one hundred eighty (180) days prior written notice of its intent to do so. Then and in such event, this Lease and the tenancy so created shall terminate. Tenant shall be under no further obligation to pay rent from and after the termination date as specified in the aforementioned notice. Landlord and Tenant shall be under no further obligation to each other, except with respect to any liabilities incurred by either of the parties pursuant to the terms and conditions of the Lease prior to the date of termination.

### ARTICLE 70
### NOTICE TO MORTGAGEE

After receiving written notice from any person, firm, or other entity, that it holds a mortgage (which term shall include a deed of trust) which includes as part of the mortgaged premises the Leased Premises, Tenant shall, so long as such mortgage is outstanding, be required to give to such holder the same notice as is required to be given to Landlord under the terms of this Lease, but such notice may be given by Tenant to Landlord and such holder concurrently. It is further agreed that such holder shall have the same opportunity to cure any default, and the same time within which to effect such curing, as is available to Landlord plus an additional sixty (60) days and such further time as shall be required to gain control over the Shopping Center in order to effect such cure; and if necessary to cure such a default, such holder shall have access to the Leased Premises.

### ARTICLE 71
### PATRIOT ACT

Tenant represents and warrants as to itself and its shareholders, partners and members that neither Tenant nor any shareholders, partners or members of Tenant is listed in Executive Order 13224-Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism, as amended ("Executive Order 13224"), and Tenant has no present, actual knowledge that any other persons or entities holding any legal or beneficial interest whatsoever in Tenant are included in, owned by, controlled by, knowingly acting for or on behalf of, knowingly providing assistance, support, sponsorship, or services of any kind to, or otherwise knowingly associated with any of the persons or entities referred to or described in Executive Order 13224, or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control. Any breach by Tenant of the foregoing representations and warranties shall be an event of Default by Tenant and shall be covered by the indemnity provisions of Article 20 of this Lease.

*[REST OF THIS PAGE INTENTIONALLY LEFT BLANK]*

IN WITNESS WHEREOF, the parties hereto have set their Hands and Seals the day and year first above written.

WITNESS AS TO LANDLORD:

_____
*[Signature]*

_____
*[Print Name]*

_____
*[Signature]*

Lisa Marsha'
_____
*[Print Name]*

LANDLORD:

**BISCAYNE COMMONS (EDENS), LLC,** a South Carolina limited liability company

By:  Edens Limited Partnership, a Delaware limited partnership, its sole member

    By:  Edens GP, LLC, a Delaware limited liability company, its sole general partner

       By: _____
           Jodie W. McLean
         President & Chief Investment Officer

WITNESS AS TO TENANT:

_____
*[Signature]*

MICHAEL S. Sweer
_____
*[Print Name]*

_____
*[Signature]*

Loretta M Ayer
_____
*[Print Name]*

TENANT:

**PALM BEACH GOLF CENTER – MIAMI, LLC**, a Florida limited liability company

By:  Waltrav, LLC, a Florida limited liability company, its member

    By: _____
    Name: _____
    Its: _____

EXHIBIT A
SITE PLAN



Biscayne Commons

North Miami, FL
8/20/2012
2438

**EXHIBIT B**
**LANDLORD'S WORK**

The Leased Premises is provided to Tenant in its current "as is" condition and Landlord makes no representations as to the condition of the Leased Premises.

*[REST OF THIS PAGE INTENTIONALLY LEFT BLANK]*

**EXHIBIT C**
**TENANT'S WORK**

Tenant, at its sole cost and expense, shall perform and construct, in a good and workmanlike manner, and in accordance with all applicable laws and regulations and the Shopping Center Sustainability Practices, all work necessary to prepare the Leased Premises for Tenant's business.  Prior to commencing any Tenant's Work Tenant shall provide Landlord with complete and professionally prepared building specific plans and specifications of Tenant's store and Tenant's Work, including façade elevations and details, utility layout plans and all other plans and specifications necessary to enable Tenant to complete construction of Tenant's store. Prior to Tenant commencing Tenant's Work: (i) all plans and specifications must be approved by Landlord, (ii) all contractors and subcontractors which will perform Tenant's Work must be approved by Landlord (Tenant shall provide the name, title, company name, mailing address, phone number and, if available, email address for Tenant's construction representative (and/or project manager), contractors, subcontractors, suppliers and vendors), and (iii) Tenant must comply with the insurance requirements set forth in Article 20 hereof (collectively, the "Work Requirements").  Tenant's Work shall commence upon the satisfaction of the Work Requirements.  Any and all subcontractors must expressly provide that any such subcontract shall be performed in compliance with any and all applicable Shopping Center Sustainability Practices.  Tenant shall work diligently and in a timely manner to complete Tenant's Work in accordance with the approved plans and specifications.

*[REST OF THIS PAGE INTENTIONALLY LEFT BLANK]*

**EXHIBIT D**
**SIGN CRITERIA**

**Edens & Avant**
Owner / Developer

# Tenant Sign Criteria

**Table of Contents**

**Table of Contents**

Introduction. . . . . . . . . . . . . . . . . . . . . 3
Signage Overview. . . . . . . . . . . . . . . . . 4
Color Palette. . . . . . . . . . . . . . . . . . . . 6

**Tenant Identification Signs**
Facade Mounted Signs. . . . . . . . . . . . 8
Canopy Mounted Signs . . . . . . . . . . . . 9
Blade Signs. . . . . . . . . . . . . . . . . . . . . .10

**V. Appendices**
Typical Elevation . . . . . . . . . . . . . . . . . .13

**Introduction**

The Tenant Signage Criteria is established to provide direction for the project as a whole. This criteria will help to insure that information is communicated in a distinctive and aesthetically pleasing manner.

Visual consistency, as created by the criteria, minimizes confusion and promotes an image of quality uniting all of the individual retail establishments.

The Tenant Signage Criteria establishes minimum standards and maximum sizes that are reasonable and equitable and provide sufficient flexibility to accommodate the Tenant's need to be recognizable and marketable. Appropriate levels of flexibility allow each retail chain to present their graphic identity and encourages innovation while preserving the design quality of the development.

Tenants are encouraged to use professional environmental graphic designers and signage companies to determine sign design and specifications.

It is the intent of this document is to define and document the following design criteria:

1. Define a maximum size for exterior signage.

2. Establish additional criteria that ensure consistency; these may further limit size in certain circumstances depending upon specific location of the signs.

3. Identify specific locations on facades for tenant signage. This will allow for maximum visibility at a distance and prevent arbitrary placement that conflicts with architectural elements on the facade.

All Tenants are required to have a unique identity. If a Tenant does not have an identity, the Landlord will refer the Tenant to a preferred professional designer to establish an identity. Generic business names like "Cleaners", "Bank", "Diner", etc. are not allowed.

Nothing in this document shall be construed to pre-empt any local, state, or federal regulation or ordinance. It is the responsibility of each Tenant to ensure that proposed signage meets all requirements of the local City Sign Regulations as well as all applicable building or other governmental or regulatory requirements.

Any deviation from these criteria must be approved in writing by the Landlord. The approval by the Landlord of any sign plan submitted to the Landlord shall not constitute the assumption of any liability on the part of the Landlord for their accuracy or conformity with any building or signage code or other governmental or regulatory requirements, and the Tenant shall be solely responsible for such plans and obtaining all permits and approvals from all appropriate governmental and regulatory bodies.

**Signage Overview**

1. Only signs that carry a Underwriters Laboratory (UL) rating will be permitted. Signs of the flashing, rotating, moving, blinking or animated type are not permitted.

2. The design and location of all signs must be approved in writing by the Landlord and shall be subject to the Landlord's sole discretion as to design, size, and location. The working drawings must indicate the following:

    **A.** The shopping center name
    **B.** The store name
    C. The space number
    **D.** The complete address
    **E.** The type and size of all lettering
    **F.** Elevation view of storefront showing sign (drawn to accurate scale) with overall height and width dimensions of sign, overall square footage of sign, detail dimensions of major sign elements (graphics, letterforms, etc.) and the lineardimension of the accessible storefront
    **G.** A section through the sign showing construction with overall dimensions of sign
    **H.** Colors, finishes, and types of all materials
    I. Wattage and light intensity
    **J.** Location of penetrations for conduit and sleeves, etc. required for sign installation
    **K.** A photograph of the storefront with sign location shown to scale

3. Tenant shall submit sign working drawings to the Landlord and no sign shall be installed until the Landlord's written approval has been obtained. Tenant shall provide Landlord a copy of it's sign permit prior to the installation of it's sign.

4. In the event that sign(s) do not conform to the Landlord's criteria or otherwise do not receive approval, the Tenant shall redesign the sign in question.

5. Illumination shall be internal to the sign, exposed neon within letterforms, or halo-light. Light sources shall not cause glare hazardous to pedestrians or vehicle drivers entering public streets. The overall lighting of tenant signage is assumed by this document to be white. Colored lamps shall be permitted only with Landlord approval. Red lamps are prohibited.

6. Non-illuminated storefront facade signage is prohibited without express approval of the Landlord which may be granted or denied at the Landlord's sole discretion.

7. No brand names, handwritten signs, illuminated signs, open/ closed signs, overscale banners, or any other items which in the sole option of the Landlord is detrimental to the image of the shopping center will be permitted within the tenant storefront area.

8. Small scale storefront signs, with prior landlord approval, may be placed at the pedestrian level. These signs may include Tent logo, name, website, other multi-media addresses (facebook, twitter, etc.), store hours, and address and are to be applied directly to the interior of the storefront glazing. Public safety decals, subject to landlord approval, may be used as required by applicable codes or government regulations.

9. The sign and any part or parts thereof, except as otherwise provided in this criteria, shall be located within the limits of the storefront of the premises of the Tenant.

10. All tenant signs must be new and custom made for this project.

11. No sign shall be placed in final position without approval of the Landlord. Poor quality materials or construction will not be approved. Final installation will be subject to approval and must conform to criteria and drawings provided as well as to local building codes.

12. Tenant's sign contractors shall carry all worker's compensation insurance, product and personal liability insurance with a $1,000,000.00 (1 million dollars) minimum value. Certificate of insurance shall be furnished to Landlord prior to performing work at job-site.

13. The name and/or stamp of the sign contractor or sign company, or both, shall not be exposed to view.

14. The Landlord will have final approval of contractor if signage is to be manufactured and installed by other than Landlord's suggested sign contractor. Landlord has the right to dismiss the sign contractor from the premises if any of the above-required criteria are violated.

15. Tenant shall provide a dedicated circuit for the Tenant's signage illumination, and shall coordinate and utilize Landlord-provided master switching relay system for all illuminated signage.

16. Service/rear egress/delivery doors to Tenant areas will have standard identification (Tenant's name and address number) designed and installed by the Landlord at the Tenant's expense. No other signing or graphic is permitted at the service entrance.

17. Tenant's responsibility for maintaining the Demised Premises in good condition shall include the obligation to maintain it's exterior signage in good working order (e.g., without warpage, peeling paint, defective illumination, etc.) as initially approved by the Landlord. In the event of any deterioration in the condition of such signage, the Tenant  shall promptly, upon notice from the Landlord, correct any and all deficiencies in such conditions.

**Signage Overview**

18. All system components shall be manufactured in strict accordance with the current requirements of the Underwriter's Laboratories, Inc. "Standards for Safety," and others as may be applicable. A UL listing shall be provided and the appropriate label or labels shall be affixed to each fixture in a position concealing it from normal view.

19. The signage contractor shall perform all cutting and patching of existing surfaces where required for installation of the signage work included herein. The procedures proposed for the accomplishment of cutting and patching work shall be submitted by the sign contractor to the Landlord for approval. The procedures shall include a detailed description of the methods and equipment to be used for each operation and the sequence of operations al materials for patching and repairing of existing surfaces shall match existing adjacent surfaces in all respects.

20. Upon termination of the Tenant lease, the Tenant shall be responsible for removal of their facade and/or canopy mounted sign. Tenant will also be responsible for any patch and repairs to facade to like new conditions. All patch and repairs are subject to approval by Landlord.

**Color Palette**

| | | | |
|---|---|---|---|
| PMS Black | PMS White | PMS Cool Gray 9 | White illumination |

The colors shown here are the project base colors. Tenant signage may use these colors, and/or their own logo colors. Subject to the review, these colors may be modified due to changes in market conditions and prevailing styles, provided that the color palette is consistently used among all signs using the standard typography.

The project colors will be used as appropriate for the signs and accent features on the sign structures.

Specific materials for each sign type are specified with each sign type description.

Red is prohibited, without prior Landlord approval.

# Tenant Identification Signs

**Tenant Identification Signs**



10" clearance from sign band edges and 12" clearance from demising wall center line are minimum

1'-0"   top edge of sign band   1'-0"

area for Tenant sign; maximum area to be determined by Landlord

bottom edge of sign band

center line of demising wall

center line of demising wall

1  Elevation Diagram
   SCALE: 3/16"=1'

8" max    8" max    6" max

slimline LED lamps

Channel-letter with LED illumination    Reverse channel-letter with halo-light*    Push- through letters with internal illumination*

2  Section Diagrams-Cabinet Signs
   SCALE: 3/4"=1'

**Facade Mounted Signs**

Every retail/restaurant Tenant shall be allowed one (1) storefront facade mounted sign, however, a retail/restaurant Tenant of a corner store or angle wall front may have one (1) sign on each facade, thereof, providing the arrangement of same meets the approval of the Landlord and is within the restrictions of the local sign code.

Letters forms may be the Tenant's standard corporate identity letter style, subject to Landlord approval. In the event that the Tenant's standard letter style is unacceptable or non-existent, the Tenant shall be required to use the Landlord's standard typeface, Gotham Bold.

Facade mounted sign design shall consist of a fabricated sign panel with painted finish (no raceway) and push-through or individual letterforms as required. The letterform returns and sign panel faces are painted black. Faces of letterforms may have laminated translucent color vinyl. Red is prohibited without prior Landlord approval.

Exhibit "B" Sign Specification          18 March 2011          Page 8

**Tenant Identification Signs**

 

slimline LED lamps

letterforms paint white

backplate paint black; backplate to be cut to match letterform shapes

raceway to be painted and detailed to match and "blend in with" canopy; raceway cannot extend past outermost letterforms

Channel-letter with LED illumination

Reverse channel-letter with halo-light*

1 Section Diagrams
SCALE: NTS

1'-6" max

1'-6" max

**Canopy Mounted Signs**

Depending on architecture of the shopping center, applicable Tenants may, with Landlord approval, use a canopy mounted sign as retail identification. Approved Tenants shall be allowed one (1) canopy mounted sign mounted sign, however, a retail/restaurant Tenant of a corner store or angle wall front may have one (1) sign on each facade, thereof, providing the arrangement of same meets the approval of the Landlord and is within the restrictions of the local sign code. Canopy sign cannot be used as primary retail identification if Tenant also has a facade mounted sign.

Letters may be the Tenant's standard corporate identity letter style. In the event that the Tenant's standard letter style is unacceptable

or non-existent, the Tenant shall be required to use the Landlord's standard typeface, Gotham Bold.

Canopy mounted sign design shall consist of channel-letters with LED illumination mounted to leading edge of canopy. Electrical to be hidden within canopy. Raceway to be painted and detailed to match canopy. Raceway can be mounted on canopy face or top and ends cannot extend past outermost letterforms. Letterform returns are painted black.

Option to channel-letters are:
Reverse channel-letters with halo illumination

**Tenant Identification Signs**



**Blade Signs**

Every retail/restaurant Tenant shall be allowed one (1) blade sign, however, a retail/restaurant Tenant of a corner store or angle wall front may have one (1) blade sign on each facade, thereof, providing the arrangement of same meets the approval of the Landlord and is within the restrictions of the local sign code. Blade signs will be located within the Tenant's storefront area and in close proximity to storefront entry doors.

Blade signs may include the individual logo and typography of the retail enterprise. Shown here is the Landlord standard blade sign. Tenants can design individual blade signs provided the design meets the dimensional qualities and size limitations of the Landlord's standard design. Blade signs are non-illuminated.

Blade signs may not obstruct any pedestrian way. Clearance below sign to comply with restrictions of the local sign code.

**Tenant Identification Signs**








**Blade Signs - Continued**

Blade sign examples shown here illustrate the quality that
individually Tenant designed blade are expected to have. Blade
signs are non-illuminated.

# Appendices

Appendices





1 Typical Elevation
  SCALE: NTS

**Typical Elevation**

The elevation diagram shown represents a typical retail building elevation. The actual elevation of the shopping center will vary. The identified areas show where the different sign types may be placed on the facade.

Facade mounted signs shall have a minimum 10" clearance from the top and bottom edges of the sign band and a minimum clearance of 1'-0" from the center line of the demising wall. Maximum area shall be determined by Landlord based on building architecture and storefront location. Facade mounted signs shall not overlap any architectural features like window lintels, canopy support anchor plates, coping, etc. Facade mounted signs will maintain a minimum clearance of 8" around architectural features.

Canopy mounted signs have a maximum height of 1'-6" and cannot extend past the outermost canopy support cable or canopy end (whichever provides greater clearance.) Canopy mounted signs cannot extend below the canopy

Blade signs have maximum dimensions of 1'-6"h x 3'-0"w and have a minimum clearance of 9'-0".

Actual sign locations will be determined by the Landlord.

## EXHIBIT D-1





 Tenant's Position on Monument Sign

**EXHIBIT E**
**FORM OF GUARANTY OF LEASE**

**GUARANTY OF LEASE**

The undersigned **William J. Walsh and Mark C. Travaglini**, jointly and severally herein called Guarantors hereby unconditionally and irrevocably guarantee to Landlord (a) the due and punctual payment in full (and not merely the collectibility) of all Rent, Additional Rent, and all other amounts due and payable by Tenant under the Lease dated _____, 2012 by and between **BISCAYNE COMMONS (EDENS), LLC** as Landlord and **Palm Beach Golf Center - Miami, LLC** as Tenant; and (b) the full and faithful performance and observance of all terms, covenants, and conditions contained in said Lease to be performed or observed by Tenant.

Notwithstanding anything in this Guaranty to the contrary, upon Tenant's full payment and performance of all obligations of Tenant under the Lease accruing through the end of the second Lease Year, Guarantors' aggregate liability for the foregoing liabilities of Tenant through the remainder of the Term shall not exceed the amount of one (1) year's Rent due and payable under the terms of the Lease, commencing on the date of any claim by Landlord hereunder and ending one (1) year thereafter; provided, however, that in the event any such claim shall be made at any time within the final one (1) year prior to its expiration, whether during the initial term or any renewal option period, the foregoing limited guaranty amount shall be equal to the Rent payable by Tenant during said final one (1) year period.

Guarantors expressly agree that Landlord may, in its sole and absolute discretion, without notice to or further consent of Guarantors and without in any way releasing, affecting, or impairing the obligations and liabilities of Guarantors hereunder (a) waive compliance with any of the terms of the Lease; (b) modify, amend, or change any provisions of the Lease by agreement between Tenant and Landlord; (c) grant extensions or renewals of the Lease and/or effect any release, compromise, or settlement in connection therewith; (d) assign or otherwise transfer all or part of its interest in the Leased Premises, or this Guaranty or any interest therein or herein; and (e) consent to an assignment, subletting, conveyance, or other transfer of all or any part of the interest of Tenant in the Lease.

If Tenant holds over beyond the term of the Lease, Guarantors' obligations hereunder shall extend and apply with respect to the full and faithful performance and observance of all of the covenants, terms, and conditions of the Lease and of any such modification thereof. This Guaranty, and all of the terms hereof, shall be binding on Guarantors and the successors, assigns, and legal representatives of Guarantors. Guarantors do not require and hereby waives all notices of Tenant's nonpayment, nonperformance, or nonobservance of the covenants, terms, and conditions of the Lease. Guarantors hereby expressly waive all notices and demands otherwise required by law which Guarantors may lawfully waive.

Insofar as the payment by Tenant of any sums of money to Landlord is involved, this Guaranty is a guaranty of payment and not of collection, and shall remain in full force and effect until payment in full to Landlord of all sums payable under the Lease. Guarantors waive any right to require that Landlord bring any legal action against Tenant before, simultaneously with, or after enforcing its rights and remedies hereunder against Guarantors. Landlord shall not be required to make any demand on Tenant, apply any security deposit being held by Landlord on behalf of Tenant or any other credit in favor of Tenant, or otherwise pursue or exhaust its remedies against Tenant before, simultaneously with, or after enforcing its rights and remedies hereunder against Guarantors. Neither Guarantors' obligation to make payment in accordance with the terms of the Guaranty nor any remedy for the enforcement thereof shall be impaired, modified, released, limited, or affected in any way by any impairment, modification, release, or limitation of the liability of Tenant or its estate in bankruptcy, resulting from (a) the operation of any present or future provision of the Bankruptcy Code of the United States or from the decision of any court interpreting the same; (b) the rejection, or disaffirmance, of the Lease in any such proceedings; or (c) the assumption and assignment or transfer of the Lease by Tenant or Tenant's bankruptcy trustee.

Guarantors represent and warrant that this Guaranty has been duly authorized by all necessary corporate action on Guarantors' parts, has been duly executed and delivered by a duly authorized officer, and constitutes Guarantors' valid and legally binding agreements in accordance with its terms. The liabilities of Guarantors are coextensive with that of Tenant and also joint and several, and legal action may be brought against Guarantors and carried to final judgment either with or without making

Tenant a party thereto.  Until all of Tenant's obligations under the Lease are fully performed, Guarantors (a) waive any rights that Guarantors may have against Tenant by reason of any one or more payments or acts in compliance with the obligations of Guarantors under this Guaranty; and (b) subordinates any liability of indebtedness of Tenant held by Guarantors to the obligations of Tenant to Landlord under its Lease.

Guarantors waive the benefit of any statute of limitations affecting Guarantors' liabilities under this Guaranty.  This Guaranty shall be governed by and construed in accordance with the laws of the State in which the Leased Premises encumbered by the Lease shall exist.  Guarantors hereby consent to the jurisdiction of any competent court within said State and in Landlord's discretion, including, without limitation, Federal courts of the United States. Guarantors hereby waive trial by jury in any action brought on or with respect to this Guaranty.  Guarantors agree to pay all costs and expenses incurred by Landlord in enforcing this Guaranty, including, without limitation, all legal fees and disbursements.

Within seven (7) business days after each request by Landlord is received by Guarantors, Guarantors shall deliver estoppel certificates to Landlord ("Estoppel Certificate") certifying in writing that this Guaranty remains in full force and effect and such other matters as reasonably requested by Landlord.  Each Estoppel Certificate shall be made in favor of Landlord, any mortgagee, any assignee, any purchaser or any other person specified by Landlord.

IN WITNESS WHEREOF, the undersigned has signed this Guaranty this _____ day of _____, 2012.


**WITNESS AS TO GUARANTOR:**                   **GUARANTOR:**

_____                _____
*[Signature]*                                   **William J. Walsh**

_____                _____
*[Print Name]*                                  *[Address]*

                                                _____
                                                *[Address]*

_____                _____
*[Signature]*                                   *[Phone Number]*

_____
*[Print Name]*


**WITNESS AS TO GUARANTOR:**                   **GUARANTOR:**

_____                _____
*[Signature]*                                   **Mark C. Travaglini**

_____                _____
*[Print Name]*                                  *[Address]*

                                                _____
                                                *[Address]*

_____                _____
*[Signature]*                                   *[Phone Number]*

_____
*[Print Name]*

**EXHIBIT F**
**FORM OF ACCESS AGREEMENT**

**ACCESS AGREEMENT**

1. Subject to the limitations set forth in this Access Agreement (the "Agreement"), _____(the "Undersigned"), as tenant, hereby gives permission to the Miami-Dade County Department of Environmental Resources Management ("DERM") and DERM's agents and contractors to enter the Undersigned's leasehold located at _____ Biscayne Boulevard, North Miami Beach, Florida (the "Subject Leasehold"). The Subject Leasehold is located within the Biscayne Commons retail project more particularly described as set forth at Exhibit A (the "Subject Property").

2. This permission to access the Subject Leasehold is specifically limited to the following activities, which may be performed by DERM or DERM's agents or contractors:

    a. All actions which are reasonable and necessary to conduct a complete hydrogeologic study of the Subject Property to determine the extent of any soil, surface water or ground water contamination which may be present.

    b. Install soil borings and monitoring well(s) clusters and sample for soil and ground water quality for the purpose of defining the vertical and horizontal extent of any contamination.

    c. Removal, treatment, or disposal of contaminated soil and water, which may include but is not limited to the installation of recovery wells or other treatment systems.

3. The granting of this permission by the Undersigned is not intended, nor should it be construed, as an admission of liability on the part of the Undersigned or its grantees, successors, and assigns for any contamination discovered on the property.

4. Upon two (2) business days written notice, DERM or DERM's agents or contractors may enter the Subject Leasehold during normal business hours and may also make special arrangements to enter the Subject Leasehold at other times with written permission from the Undersigned.

5. The Undersigned shall not be liable for any injury, damage or loss on the Subject Leasehold suffered by DERM or DERM's agents or contractors which is not caused by the negligence or intentional acts of the Undersigned, its agents or its employees.

6. DERM acknowledges and accepts its responsibility under applicable law (Section 768.28, Florida Statutes) for damages caused by the acts of its employees while on the Subject Leasehold.

7. This Agreement shall become null and void and the access granted to DERM and DERM's agents and contractors shall be rescinded upon revocation or termination of the Brownfield Site Rehabilitation Agreement governing the Subject Property.

*[Signature page to follow]*

Accepted on this the _____ day of _____,20____.

TENANT:

**PALM BEACH GOLF CENTER – MIAMI, LLC**, a Florida limited liability company

By:  Waltrav, LLC, a Florida limited liability company, its
     member

     By: _____
     Name: _____
     Its: _____


Accepted on this the _____ day of _____,20____.

**Miami-Dade County Department of
Environmental Resources Management**

By: _____

Name: _____

Title: _____

Exhibit A

**Parcel 1:**

Lots 1 through 9, inclusive, Block 1, of PAGRO SUBDIVISION, according to the Plat thereof, recorded in Plat Book 105, page 59, of the Public Records of Miami-Dade County, Florida.

**Parcel 2:**

TOGETHER WITH non-exclusive easement for the benefit of the public and the insured property as described in the Easement Agreement by and between Costco Properties Inc., and the Florida Department of Transportation dated November 13, 1992, recorded December 17, 1992 in Official Record Book 15752, page 20, as amended by the Corrective Easement recorded September 10, 2002 in Official Record Book 20648, page 69, as amended by the Amended Easement recorded June 19, 2003 in Official Record Book 21344, page 4799, and the Second Amended Easement recorded July 23, 2004 in Official Records Book 22510, page 4021, and the Easement in favor of the Florida Department of Transportation and the insured property dated July 8, 2004, recorded July 23, 2004 in Official Record Book 22510, page 4016; all of the Public Records of Miami-Dade County, Florida.

# THE ROSENTHAL
### L A W   F I R M .   P . A .

Jason A. Rosenthal
JRosenthal@therosenthallaw.com
Ashley N. Rosenthal
ARosenthal@therosenthallaw.com
Andrea J. Fowler
AFowler@therosenthallaw.com
Regen J. Shanzer
RShanzer@therosenthallaw.com
Jennifer L. Morando
JMorando@therosenthallaw.com

**Orlando Office**
976 Lake Baldwin Lane
Suite 103
Orlando, FL 32814
Phone 407.488.1220
Fax 407.488.1228

**Miami Office**
1101 Brickell Avenue
South Tower, 8th Floor
Miami, FL 33131
Phone 305.755.9300
Fax 305.755.9590

November 21, 2016

**REPLY TO ORLANDO**

**VIA EMAIL AND CERTIFIED MAIL**

Michael E. Singer
Comiter, Singer Baseman & Braun
Financial Center at the Gardens
3801 PGA Boulevard, Suite 604
Palm Beach Gardens, FL  33410
Email: msinger@comitersinger.com
Certified Mail #7011 1570 0001 0351 5872

> Re:   Palm Beach Golf Center – Miami, LLC  ("Former Tenant") , William J. Walsh and Mark C. Travaglini ("Guarantors"), Biscayne Commons (Edens), LLC ("Landlord"); Shopping Center Lease Agreement ("Lease") and Guaranty of Lease ("Guaranty").

Dear Mr. Singer:

This firm represents Landlord in connection with the Lease and Guaranty.   I am advised that you represent the Former Tenant and Guarantors.   This letter is addressed to you as attorney for the Former Tenant and Guarantors.

Former Tenant is in default of the Lease by terminating the Lease prior to its expiration and abandoning the premises some time prior to July 8, 2016.  Former Tenant is also in default of the Lease for failing to pay the required monthly rent payments.  Former Tenant was advised of this default in writing pursuant to a letter from the Landlord dated July 15, 2016.  Former Tenant did not cure the default after receiving this default notice.

As of the date of this letter, Former Tenant owes Landlord past due rent charges through November, 2016, of **$151,730.88**.  Landlord demands payments of this amount within ten (10) days from your receipt of this letter.   If payment is not received, Landlord intends to file a

EXHIBIT B

November 21, 2016
P a g e | **2**

lawsuit against Former Tenant and Guarantors for breach of the Lease.    In this lawsuit, Landlord will seek reimbursement of the $210,000 tenant improvement allowance pursuant to Article 1A.3 of the Lease.   Landlord will also seeks damage against Guarantors, and Landlord acknowledges the Guarantors' limitation of liability to an amount equal to one year's rent.

### <u>NO WAIVER/RESERVATION OF RIGHTS</u>

This written notice does not constitute a waiver of any other rights or remedies which Landlord may have pursuant to the terms of the Lease, the Guaranty, or otherwise.  No failure to exercise any rights or remedies available to Landlord and no delay in exercising any such rights or remedies shall operate as a waiver of any rights which Landlord may have pursuant to the terms of the Lease, the Guaranty, or otherwise.  Further, any reference by the undersigned on behalf of Landlord to any defaults mentioned herein shall in no way constitute, or be construed to be, a waiver of any other default which may now exist or hereafter arise under the Lease or Guaranty.

The acceptance by Landlord of any payments, to the extent that they do not represent the complete and full payment of the past due rent, shall not constitute a waiver by Landlord of any defaults that exist under the Lease or Guaranty.

Sincerely,

Jason A. Rosenthal

cc:    Elias Droubi

# GUARANTY OF LEASE

The undersigned **William J. Walsh and Mark C. Travaglini**, jointly and severally herein called Guarantors hereby unconditionally and irrevocably guarantee to Landlord (a) the due and punctual payment in full (and not merely the collectibility) of all Rent, Additional Rent, and all other amounts due and payable by Tenant under the Lease dated _September 25_, 2012 by and between **BISCAYNE COMMONS (EDENS), LLC** as Landlord and **Palm Beach Golf Center - Miami, LLC** as Tenant; and (b) the full and faithful performance and observance of all terms, covenants, and conditions contained in said Lease to be performed or observed by Tenant.

Notwithstanding anything in this Guaranty to the contrary, upon Tenant's full payment and performance of all obligations of Tenant under the Lease accruing through the end of the second Lease Year, Guarantors' aggregate liability for the foregoing liabilities of Tenant through the remainder of the Term shall not exceed the amount of one (1) year's Rent due and payable under the terms of the Lease, commencing on the date of any claim by Landlord hereunder and ending one (1) year thereafter; provided, however, that in the event any such claim shall be made at any time within the final one (1) year prior to its expiration, whether during the initial term or any renewal option period, the foregoing limited guaranty amount shall be equal to the Rent payable by Tenant during said final one (1) year period.

Guarantors expressly agree that Landlord may, in its sole and absolute discretion, without notice to or further consent of Guarantors and without in any way releasing, affecting, or impairing the obligations and liabilities of Guarantors hereunder (a)  waive compliance with any of the terms of the Lease; (b) modify, amend, or change any provisions of the Lease by agreement between Tenant and Landlord; (c) grant extensions or renewals of the Lease and/or effect any release, compromise, or settlement in connection therewith; (d) assign or otherwise transfer all or part of its interest in the Leased Premises, or this Guaranty or any interest therein or herein; and (e) consent to an assignment, subletting, conveyance, or other transfer of all or any part of the interest of Tenant in the Lease.

If Tenant holds over beyond the term of the Lease, Guarantors' obligations hereunder shall extend and apply with respect to the full and faithful performance and observance of all of the covenants, terms, and conditions of the Lease and of any such modification thereof.  This Guaranty, and all of the terms hereof, shall be binding on Guarantors and the successors, assigns, and legal representatives of Guarantors.  Guarantors do not require and hereby waives all notices of Tenant's nonpayment, nonperformance, or nonobservance of the covenants, terms, and conditions of the Lease. Guarantors hereby expressly waive all notices and demands otherwise required by law which Guarantors may lawfully waive.

Insofar as the payment by Tenant of any sums of money to Landlord is involved, this Guaranty is a guaranty of payment and not of collection, and shall remain in full force and effect until payment in full to Landlord of all sums payable under the Lease.  Guarantors waive any right to require that Landlord bring any legal action against Tenant before, simultaneously with, or after enforcing its rights and remedies hereunder against Guarantors.  Landlord shall not be required to make any demand on Tenant, apply any security deposit being held by Landlord on behalf of Tenant or any other credit in favor of Tenant, or otherwise pursue or exhaust its remedies against Tenant before, simultaneously with, or after enforcing its rights and remedies hereunder against Guarantors.  Neither Guarantors' obligation to make payment in accordance with the terms of the Guaranty nor any remedy for the enforcement thereof shall be impaired, modified, released, limited, or affected in any way by any impairment, modification, release, or limitation of the liability of Tenant or its estate in bankruptcy, resulting from (a) the operation of any present or future provision of the Bankruptcy Code of the United States or from the decision of any court interpreting the same; (b) the rejection, or disaffirmance, of the Lease in any such proceedings; or (c) the assumption and assignment or transfer of the Lease by Tenant or Tenant's bankruptcy trustee.

Guarantors represent and warrant that this Guaranty has been duly authorized by all necessary corporate action on Guarantors' parts, has been duly executed and delivered by a duly authorized officer, and constitutes Guarantors' valid and legally binding agreements in accordance with its terms. The liabilities of Guarantors are coextensive with that of Tenant and also joint and several, and legal action may be brought against Guarantors and carried to final judgment either with or without making

EXHIBIT C

Tenant a party thereto.  Until all of Tenant's obligations under the Lease are fully performed, Guarantors (a) waive any rights that Guarantors may have against Tenant by reason of any one or more payments or acts in compliance with the obligations of Guarantors under this Guaranty; and (b) subordinates any liability of indebtedness of Tenant held by Guarantors to the obligations of Tenant to Landlord under its Lease.

Guarantors waive the benefit of any statute of limitations affecting Guarantors' liabilities under this Guaranty.  This Guaranty shall be governed by and construed in accordance with the laws of the State in which the Leased Premises encumbered by the Lease shall exist.  Guarantors hereby consent to the jurisdiction of any competent court within said State and in Landlord's discretion, including, without limitation, Federal courts of the United States. Guarantors hereby waive trial by jury in any action brought on or with respect to this Guaranty.  Guarantors agree to pay all costs and expenses incurred by Landlord in enforcing this Guaranty, including, without limitation, all legal fees and disbursements.

Within seven (7) business days after each request by Landlord is received by Guarantors, Guarantors shall deliver estoppel certificates to Landlord ("Estoppel Certificate") certifying in writing that this Guaranty remains in full force and effect and such other matters as reasonably requested by Landlord.  Each Estoppel Certificate shall be made in favor of Landlord, any mortgagee, any assignee, any purchaser or any other person specified by Landlord.

IN WITNESS WHEREOF, the undersigned has signed this Guaranty this 11 day of September, 2012.

WITNESS AS TO GUARANTOR:

_____
[Signature]
MICHAEL S. SINGER
[Print Name]

_____
[Signature]
Loretta M Ayer
[Print Name]

GUARANTOR:

_____
William J. Walsh
[Address]

[Phone Number]

WITNESS AS TO GUARANTOR:

_____
[Signature]
Michael S. Singer
[Print Name]

_____
[Signature]
Loretta M Ayer
[Print Name]

GUARANTOR:

Mark C. Travaglini
Mark C. Travaglini
[Address]

[Address]

[Phone Number]